293 N.J. Super. 374 (1996)
680 A.2d 1103
TITO COBO, DAVID CARRENO, NORMA CANTOS AND JOSE FERNANDEZ, BY THEIR ASSIGNEE, HUDSON PHYSICAL THERAPY SERVICES, PLAINTIFF-RESPONDENT/CROSS-APPELLANT,
v.
MARKET TRANSITION FACILITY, BY ITS SERVICING CARRIER, MATERIAL DAMAGE ADJUSTMENT CORP., DEFENDANT-APPELLANT CROSS-RESPONDENT. LYDIA RIVERA AND KESHA FINLEY, BY THEIR ASSIGNEE, HUDSON PHYSICAL THERAPY SERVICES, PLAINTIFF-RESPONDENT CROSS-APPELLANT,
v.
NEW JERSEY AUTOMOBILE FULL INSURANCE UNDERWRITING ASSOCIATION, BY ITS SERVICING CARRIER, MATERIAL DAMAGE ADJUSTMENT CORP., DEFENDANT-APPELLANT CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued May 20, 1996.
Decided August 15, 1996.
*376 Before Judges PETRELLA, SKILLMAN and EICHEN.
Sharon M. Hallanan, Deputy Attorney General argued the cause for appellants (Deborah Poritz, Attorney General, and Gebhardt & Kiefer, attorneys; Joseph Yannotti, Assistant Attorney General, of counsel; Ms. Hallanan and Jacob Papay, Jr., on the brief).
Gerald H. Baker argued the cause for respondent (Baker, Garber, Duffy & Pedersen, attorneys; Mr. Baker, of counsel and on the brief).
The opinion of the court was delivered by EICHEN, J.A.D.
*377 In 1993, Hudson Physical Therapy Services (HPTS) filed thirteen separate actions in the Special Civil Part against The Market Transition Facility (MTF) and the New Jersey Automobile Full Insurance Underwriting Association (JUA), by their servicing carriers, Warner Insurance Systems (Warner) and its sub-contractor Material Damage Adjustment Corporation (MDA) (collectively defendants). HPTS brought the suits as assignee of the rights of various individual insureds injured in automobile accidents under their automobile insurance policies to compel increased personal injury protection (PIP) benefit payments for physical therapy services HPTS had rendered to the insureds. HPTS operates from a facility in Jersey City and is engaged in the business of providing physical therapy services to patients, 70% of whom have their charges paid through the No-Fault provisions of their automobile insurance policies.
The thirteen suits were consolidated for discovery and case management. Thereafter, six "test cases"[1] from the original thirteen suits were selected for a non-jury trial to determine whether HPTS's fees charged to these PIP claimants were reasonable and in accordance with applicable law. The parties stipulated that the court's determination as to the reasonable and appropriate fees on the six test cases would be binding on all other claims against defendants by HPTS.[2]
The fee dispute arose after HPTS changed its billing method for PIP claimants in July 1990 from one involving a flat fee for each *378 treatment session to a modality-based billing method involving separate fees for each procedure performed during a visit. After HPTS changed to a modality-based billing method, the Commissioner of Insurance (the Commissioner) adopted regulations, N.J.A.C. 11:3-29.1 to -29.6,[3] establishing regionally-based medical fee schedules for reimbursing health care providers like HPTS, N.J.A.C. 11:3-29.1. The medical fee schedules set fee rates consistent with a modality-based billing method. N.J.A.C. 11:3-29.6. The regulations also established a formula for calculating reimbursement when multiple procedures are performed on the same patient by the same provider during the same visit (the multiple procedures reduction formula). N.J.A.C. 11:3-29.4(f).[4] After the regulations were adopted on January 25, 1991, HPTS conformed its modality-based billing method to the medical fee schedules set forth in N.J.A.C. 11:3-29.6 (the PIP schedules).[5] When HPTS conformed its billing to the PIP fee schedules, it applied the multiple procedures reduction formula. At first, in utilizing the formula, HPTS applied the formula anew for each separate body part or region that was treated in the same visit. After the regulations were amended on April 6, 1992, HPTS applied the formula to all procedures performed in one visit regardless of whether the procedures were performed on the same or different body parts.
*379 Four different billing periods were at issue in the six cases as follows: (1) May 3, 1990 to June 30, 1990 (Period I) (when HPTS billed treatment sessions at a flat fee rate of $75); (2) July 1, 1990 to January 25, 1991 (Period II) (when HPTS billed on a modality basis at the rate of $20 to $25 for each procedure performed during a session); (3) January 25, 1991 to April 6, 1992 (Period III) (when HPTS billed procedures at the PIP fee schedule rate, and applied the multiple reduction formula anew for each separate body part or region treated in the same visit); and (4) April 6, 1992 to the present (Period IV) (when HPTS billed procedures at the PIP fee schedule rate and applied the multiple reduction formula to all procedures performed in one visit regardless of body part).
The MTF and the JUA declined to pay the modality-based claims on the grounds that the PIP fee schedules merely established the upper limit on medical bills and that, under the regulations, the insurer was obligated to pay no more than "the provider's usual, customary and reasonable fee," as stated in N.J.A.C. 11:3-29.4(a). Defendants asserted that HPTS's usual, customary and reasonable fee was its earlier flat rate, not the modality-based fees. Defendants also asserted that, to the extent HPTS was entitled to bill them at the limit established by the PIP fee schedules, they had misapplied the multiple procedures reduction formula during Period III.
At trial, HPTS presented evidence that on July 1, 1990, HPTS changed its billing method from a flat rate of $75 per visit to a modality basis. By doing so, HPTS asserted that the modality method of charging was established at that time as HPTS's usual customary and reasonable practice. They also asserted that when the PIP fee schedules were adopted on January 25, 1991 and HPTS again changed its billing method to conform to those schedules, the resulting charges were essentially the same as in Period II and, therefore, the HPTS fees based upon the PIP fee schedules were its usual, customary and reasonable fees for Periods III and IV.
*380 Defendants countered that HPTS's usual, customary and reasonable fee throughout all four periods was its flat rate, and not the subsequent modality-based rates. As an illustration, defendants presented a comparison of the total cost of services for the six test-case plaintiffs showing that under the flat fee basis in June 1990 (Period I), the total charges would have been $14,505 as compared with $31,109 in July 1990 (Period II), and $33,989 in February 1991 when the fee schedules were adopted (Period III). Thus, defendants argued billing under the modality-based rate is double that under the flat-fee rate.
The trial court held that HPTS's fees for physical therapy services rendered to plaintiffs during each of the four billing periods were its usual, customary and reasonable fees, even though they increased substantially when HPTS changed its billing method. The court then awarded HPTS counsel fees as a successful claimant suing for PIP benefits. However, it also held that HPTS misapplied the regulation's multiple procedures reduction formula between January 1991 and April 1992 (Period III), resulting in an overcharge to defendants. Following trial, the court denied defendants' motion to allow them to file a counterclaim for recoupment or set off of any payments made to HPTS in excess of the amount determined by the court to be reasonable.
On appeal, defendants make the following arguments: (1) the trial court's holding that HPTS's billings were reasonable was not supported by statutory and regulatory law or by sufficient credible evidence in the record; (2) the trial court improperly denied defendants' application to reserve a claim for recoupment or set-off of any excess payments; and (3) the trial court improperly awarded counsel fees to HPTS. HPTS cross-appeals, arguing that the trial court erred in ruling that it improperly applied the multiple reduction formula during Period III. With the exception of paragraph three of the judgment which determined that HPTS erroneously applied the multiple reduction formula during Period III, we reverse the judgment. On the cross-appeal, we affirm paragraph three of the judgment.
*381 We need not detail the extensive trial testimony concerning how HPTS arrived at its modality-based method of billing; in essence, HPTS offered various explanations, including convenience and the need for greater efficiency.[6] Essentially, HPTS denied changing its billing method in anticipation of the adoption of the regulations. HPTS's comptroller testified that he did not become aware of New Jersey's proposal to establish PIP fee schedules until late December 1990, shortly before the schedules went into effect, and that only after the schedules became effective in January 1991, did HPTS change from its own modality-based billing method to a modality-based method that conformed to the fee schedules. Defendants presented evidence to the contrary, namely that many providers were aware the fee schedules were coming and changed from the flat fee based billing practice to the modality-based billing method before the PIP fee schedules were first promulgated, in anticipation of them.
Additionally, defendants presented evidence to demonstrate that HPTS's fees were unreasonable for the geographic region in which HPTS was located. The evidence consisted of their auditors' recommendations which were based on data from trade publications, Medicare schedules, fee surveys and the results of audits of actual provider bills. Based on this data, the auditors recommended that reasonable fees for services provided by HPTS were in the range of $60 to $70 per visit.
For Period I, May 3, 1990 to June 30, 1990, the court found that HPTS's usual, customary practice was to charge a $75 flat rate. The court found there was no testimony to indicate that the rate *382 was unreasonable. (Defendants are not appealing this aspect of the court's decision.)
For Period II, July 1, 1990 to January 25, 1991, the court found that it was the usual, customary practice of HPTS to charge not only PIP carriers but also workers' compensation and major medical carriers on a modality basis. Relying on the comptroller's testimony, it referred to modality-based billing as "the more correct accounting procedure to tie the service rendered to the mode of treatment." Although the court recognized that after the change to modality-based billing, HPTS's bills went up "dramatically," it observed that the billing method was "rationally related to the physical therapy services that were rendered," especially when one considers that the services were rendered to automobile accident victims who typically are injured in multiple body regions, noting that "with three or four modalities of treatment per region, the bills are going to go up." The court also noted that defendants were unable to justify the reasonableness of a $60 flat fee.
For Period III, January 25, 1991 to April 6, 1992, the court found that HPTS's usual, customary practice was to bill all insurers  PIP, Workers' Compensation, and Major Medical carriers  per modality using the rates set by the fee schedules. The court concluded that the fee schedules themselves were "evidence of the intent of the Department of Insurance that physical therapists list the variety of modes of treatment that were rendered." However, the court found HPTS had incorrectly applied the multiple procedures reduction formula separately for each different body part or region treated, rather than to all procedures performed in one visit regardless of the body part or region. Thus, the court concluded HPTS would have to recalculate the third-period bills and reduce them accordingly.
The court found that HPTS's billing practices in Period IV were "appropriate, usual, and customary billing practices" for all the insurers it dealt with. Furthermore, the court determined that whether HPTS's rates were reasonable was "answered by the fee *383 schedule.... It sets forth what the reasonable rate is for that mode of physical therapy treatment."
The court found that the setting of flat rates by defendants' auditors "effectively undermined the Department of Insurance fee schedule and the authorization of [N.J.S.A.] 39:6A-4.6." The court concluded that defendants' auditors were ignoring the judgment of the Department, which was based on its analysis of millions of bills of health care providers and its determination of what 75% of the health care providers in the region were charging.

I.
Defendants contend that the trial court erred in finding that the fees charged by HPTS in Periods II, III, and IV were reasonable because such a finding was supported neither by the PIP statutes and regulations nor by sufficient credible evidence in the record. They argue that the dramatic increase in HPTS's fees during Period II, when HPTS changed to a modality-based billing system, was proof of their unreasonableness, and that the court erred in concluding that the rates during Periods III and IV were reasonable merely because HPTS's fees conformed to the PIP fee schedules. Furthermore, defendants contend that the trial court inappropriately placed on defendants the burden of proving the reasonableness of the fees authorized by their auditors' rather than requiring HPTS to prove the reasonableness of its fees.
Generally, the fact-findings of a trial court sitting without a jury should be affirmed if supported by sufficient credible evidence in the record. Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 483-84, 323 A.2d 495 (1974). However, if the judge "misconceives the applicable law, or misapplies it to the factual complex," the reviewing trial court must adjudicate the controversy anew. Kavanaugh v. Quigley, 63 N.J. Super. 153, 158, 164 A.2d 179 (App.Div. 1960). In this case, we perceive that the court misapplied the law to the factual complex. In our view, the court erroneously concluded, based on an inadequate record, that *384 HPTS's fees were reasonable merely because they were either modality-based or consistent with the PIP fee schedules.
The No-Fault Act, N.J.S.A. 39:6A-1 to -35, mandates that automobile liability insurance policies provide PIP coverage, including payment of "reasonable medical expenses," N.J.S.A. 39:6A-4(a). The statute, however, does not offer extensive guidance concerning the scope of that phrase, leaving to the courts "the task of construing the statutory language in a manner consistent with the objectives and intent of the Legislature." Thermographic Diagnostics v. Allstate Ins. Co., 125 N.J. 491, 508, 593 A.2d 768 (1991).
The No-Fault Act was enacted in 1972 with four objectives in mind: (1) prompt reparation to accident victims, (2) cost containment of automobile insurance, (3) availability of insurance, and (4) easing of the judicial caseload, ibid., and was amended frequently in order to more effectively lower the continuously spiralling cost of insurance. Roig v. Kelsey, 135 N.J. 500, 504, 641 A.2d 248 (1994). In relevant part, the 1988 amendments, L. 1988, c. 119, required the Commissioner to adopt medical fee schedules, on a regional basis, which would impose limits on the amount that automobile insurers would have to reimburse insureds for medical expenses under their PIP coverage. N.J.S.A. 39:6A-4.6 (1988) (amended 1991). N.J.S.A. 39:6A-4.6 mandates that the fee schedules be based on the type of service provided and "incorporate the reasonable and prevailing fees of 75% of the practitioners within the region." The statute also explicitly establishes the fee schedule rates as a ceiling on reimbursable costs:
No health care provider may demand or request any payment from any person in excess of those permitted by the medical fee schedules established pursuant to this section, nor shall any person be liable to any health care provider for any amount of money which results from the charging of fees in excess of those permitted by the medical fee schedules established pursuant to this section.
[N.J.S.A. 39:6A-4.6.]
Both the history of the promulgation of the PIP fee schedules and the regulatory language itself, N.J.A.C. 11:3-29, offer clear *385 guidance on how the schedules are to be applied. The regulation concerning application of the fee schedules provides in part:
(a) Every policy of automobile insurance and motor bus insurance issued in this State shall provide that the automobile insurer's limit on liability for medically necessary expenses payable under PIP coverage ... is the fee set forth in this subchapter. Nothing in this subchapter shall, however, compel the PIP insurer ... to pay more for any service or equipment than the provider's usual, customary and reasonable fee, even if such fee is well below the automobile insurer's ... limit of liability as set forth in the fee schedules.

[N.J.A.C. 11:3-29.4(a) (emphasis added).]
In the adoption notice on December 17, 1990, the Commissioner said that N.J.A.C. 11:3-29.4(a) had been revised since originally proposed in 1989 in order to
clarify and emphasize that the reference in amended N.J.S.A. 39:6A-4.6 to the "reasonable and prevailing fees of 75% of the practitioners within the region" is not to be interpreted to mean that the prevailing fee at the 75th percentile should constitute a floor as well as a limit. On the contrary, health care providers are expected to continue to charge their usual, customary and reasonable fee  even if it is well below the 75th percentile.

[22 N.J.R. 3810 (Dec. 17, 1990) (emphasis added).]
Among the fees that constituted the Commissioner's database and subsequent determination of the 75th percentile were those charged by health care providers with different levels of training and specialization who were performing the same services. Thus, on February 19, 1991, responding to a comment regarding the possibility of establishing separate fee schedules for chiropractors and medical doctors (later dropped), the Commissioner stated:
The principal objective of the fee schedules is to reduce the level of medical expenses resulting from motor vehicle injuries.... The amounts appearing on the fee schedule represent the upper limits permitted by law; however, a practitioner whose reasonable and customary fee is well below this limit will not be permitted to suddenly raise his or her fee to the maximum merely because of the existence of the higher amount on the schedule.

[23 N.J.R. 537-38 (Feb. 19, 1991) (emphasis added).]
Based on the foregoing, it appears the Commissioner contemplated that while a medical doctor performing a procedure might customarily charge more to perform the same procedure than a chiropractor would, separate fee schedules for medical doctors and chiropractors would not be necessary because the fee schedules merely provided the maximum that could be charged. The fee *386 schedules were not to serve as a justification for increasing a chiropractor's fees to the fee schedule rates, which prescribed an upper limit that might customarily be charged by a physician. For a chiropractor, the fee schedule rate may not be reasonable.
On April 6, 1992, a comment regarding the language of the amended multiple reduction formula raised the question of whether insurers might construe the regulatory language as allowing them to establish their own reasonable and appropriate fees. The Commissioner responded:
The provider, in submitting the billings, makes the initial determination as to what his or her usual, customary and reasonable fee is. It is incumbent on the insurer, based on its experience with the particular provider or other providers in the region, to determine whether, in fact, the usual, customary and reasonable fee has been billed. The effectiveness of the medical fee schedules in reducing the cost of auto insurance in New Jersey is dependent upon adherence by insurers to this review process.
[24 N.J.R. 1348 (Apr. 6, 1992) (emphasis added).]
Thus, the scheme envisions that the health care provider will set its own customary fee, not the insurer or the insurer's auditor. But, at the same time, the insurer has a mandate to review the provider's bills to ensure that it has billed at its customary and reasonable rate.
A comment and the Commissioner's response on April 6, 1992, show that the Commissioner considered that flat fee or time-based billing methods rather than a modality-based billing method might be appropriate for physical therapy services:
COMMENT: An appropriate way to bill for physical therapy services is a flat rate with an increase dependent upon time that is required to treat the patient. My billing procedure has always been based on a flat fee which is presently $65.00 per treatment no matter what the patient receives, with an extended visit billing if the treatment exceeds one hour of time. That fee is one-half the base fee which would be $33.00. The new PIP fee schedule has forced physical therapists into billing by modality which has driven up the cost to the third party carriers and the consumers of health care in New Jersey.

RESPONSE: The Department intends to propose a new time-based fee schedule which would apply to physiotherapy type services to which the present physician's fee schedule would no longer be applicable. In the meantime, physical therapists may continue to bill (and insurers reimburse) on the basis of a flat fee as long as the nature of the services are adequately described and the fee accurately reflects the eligible charge.
[24 N.J.R. 1348 (Apr. 6, 1992) (emphasis added).]
*387 Against this background of legislative and regulatory development, we consider defendant's claim that the trial court erred in determining HPTS met its burden of proving its fees were "reasonable" in the six test-cases because HPTS adhered to the fee schedules. In Thermographic, supra, 125 N.J. 491, 593 A.2d 768, our Supreme Court discussed the meaning of "reasonable" medical expenses in the context of the medical fee schedules. Agreeing with this court, the Supreme Court decided that the "customary and prevailing" fees for thermography "should not be conclusive in determining whether those fees are reasonable." Id. at 516, 593 A.2d 768. Thus, the Court remanded the matter to the trial court for a determination of the reasonableness of plaintiff's rates, "which should not be determined solely on the basis that they are consistent with the prevailing rates." Id. at 518, 593 A.2d 768. Applying this approach, we are satisfied that the trial court mistakenly concluded that HPTS's fees were reasonable simply because they conformed to the PIP fee schedule rates. The court should have used the schedules as no more than evidence of reasonableness, and should have considered other factors, such as what other physical therapists were charging for the same services, HPTS's billing history, and the disparity in the fees charged to different insurance carriers.
As noted, the history of N.J.A.C. 11:3-29 shows that the court was mistaken in determining that the fee schedules were proof that the Commissioner intended physical therapists to adopt a modality-based billing system. According to the comment and Commissioner's response on April 6, 1992, a time-based flat fee was commonly used by physical therapists and even may have been more appropriate than a modality-based system, which appears to have been promulgated with physicians in mind. In addition, the clear language of N.J.A.C. 11:3-29.4(a) and the regulatory history show that the fee schedule rates were the maximum that providers could charge and were not intended to justify a sudden increase in a provider's usual rates.
*388 In its decision, the trial court relied heavily on the testimony of HPTS's witnesses, particularly DiMaya, HPTS's billing supervisor, and Trachtenberg, HPTS's comptroller, who testified that HPTS had changed to a modality-based billing system in July 1990, six months before the fee schedules went into effect on January 1, 1991. Based on their testimony, the court concluded that the modality-based billing rates were HPTS's "usual and customary" rates at the time that HPTS changed to the fee schedule rates in January 1991, and that this change did not result in any dramatic increase in overall charges. However, in coming to that conclusion, the court made no findings concerning the reasonableness of the fees after HPTS changed to a modality-based billing method in June 1990, resulting in doubling the cost of services between Periods I and II. In this regard, the court ignored an important aspect of the testimony of DiMaya: although HPTS changed its billing format for PIP patients in July 1990, it continued to receive the same payment from defendants  $60 per treatment session  that it had received before it changed to a modality basis. DiMaya testified that HPTS changed its billing system for convenience so that it could obtain fast reimbursement from Major Medical insurers for the deductible and co-payments not covered through PIP. But neither she nor Trachtenberg ever said that when HPTS changed the format of the bill sent to defendants, it expected to get more than the $60 flat fee that defendants had been paying previously. In fact, the record reflects that billing format sometimes had no relationship to actual payment: for example, although HPTS billed New Jersey Manufacturers (NJM) for workers' compensation claims on a modality basis, NJM paid a $70 flat fee for physical therapy treatment.
We conclude the court's determination that the modality-based rates for Period III were HPTS's usual and customary rates was not supported by adequate reasons or the evidence presented. At a new trial on remand, the trial court should carefully review the evidence to determine exactly what HPTS's usual and customary rates were in July 1990 when it converted to a modality-based billing method.
*389 We also conclude that the trial court inappropriately put the burden of justifying reasonableness of fees on defendants rather than HPTS. See Elkins v. New Jersey Mfrs. Ins. Co., 244 N.J. Super. 695, 701, 583 A.2d 409 (App.Div. 1990). Several times the court said that defendants had not justified the reasonableness of the $60 fee it was paying. For Periods II, III and IV, the court found that HPTS's billing method was reasonable but never specifically found that the fees charged during those periods were reasonable except insofar as they conformed to the PIP fee schedule rates, which the court found inherently reasonable. However, as earlier noted, because the PIP fee schedules should be considered no more than evidence of reasonableness, they alone are not enough to sustain HPTS's burden of proving that the fees charged for services to the six test-case plaintiffs were reasonable. See Thermographic, supra, 125 N.J. at 518, 593 A.2d 768. Thus, we are constrained to remand for a determination of the reasonableness of HPTS's charges for Periods II, III and IV.
On remand, the court does not have to accept the $60 fee established by MDA's independent auditor as a reasonable fee. The trial court's ruling that the auditors were not authorized to establish a provider's usual and customary rate is supported by the regulatory history. The Commissioner explicitly stated that it is the health care provider that establishes its own customary rate. Nonetheless, the record reflects that MDA's independent auditors may not have given providers a realistic opportunity to receive greater reimbursement when and if appropriate.[7] While defendants certainly may retain independent auditors to review providers' bills to assure that they are charging their "usual and customary" rates, they may not ask the auditors to set a reasonable fee and then apply that fee inflexibly.
*390 On remand, the court should take into consideration its unchallenged finding that in June 1990, $75 was a reasonable fee. It should also consider testimony that increases tied into the cost-of-living index should raise this rate annually (not disputed by defendants), and that increases for additional time spent with patients or for individual treatment are common in the industry. It should also consider evidence as to industry standards. Although there is nothing in the regulations to preclude HPTS from billing according to modality, the rates charged  whatever the billing method  must be consistent with its customary rates to be considered reasonable.

II.
We next address defendants contention that the trial court erred in denying their right under R. 4:30 to reserve a claim for recoupment or set-off of any payments made in excess of the amounts determined by the court to be reasonable.
After trial, defendants moved for an order permitting them to file a counterclaim for recoupment or set-off of alleged over-payments made by their servicing carriers other than Warner/MDA. The court denied the motion with respect to the six test cases and the additional actions filed against defendants on behalf of HPTS patients, stating that the six test cases did not involve claims adjusted by defendants' other servicing carriers, and accordingly, defendants could not set off any possible over-payments by its other servicing carriers against the judgment for the Warner/MDA claims.
Initially, we observe that defendants submitted resolution of this issue to the court's discretion, which ordinarily is binding in the absence of a clear demonstration of abuse. However, in light of our reversal of the judgment declaring the fees reasonable, we reverse the order on the set-off/recoupment issue because the court should have an opportunity to address the issue anew and give its reasons for ruling, whatever the result may be.

*391 III.
Defendants' contend that the trial court abused its discretion in awarding counsel fees to HPTS.[8] Such an award is a matter of the trial court's discretion, governed by equitable principles. Enright v. Lubow, 215 N.J. Super. 306, 313, 521 A.2d 1300 (App. Div.), certif. denied, 108 N.J. 193, 528 A.2d 19 (1987); see also Russell v. Rutgers Casualty Ins. Co., 234 N.J. Super. 175, 182, 560 A.2d 708 (App.Div. 1989).
Initially, we observe HPTS is no longer a successful claimant and thus cannot receive an award of counsel fees under R. 4:42-9(a)(6). But even if HPTS had prevailed, we agree with defendants that it was an abuse of discretion to award counsel fees in this case. The trial court awarded counsel fees simply because it found "the insurer improperly refused to pay the usual[,] customary and reasonable fees that were owed to the health care providers which necessitated the plaintiff to hire counsel and bring action before the Court so that they could make the appropriate recovery." The insureds in this case received prompt treatment and HPTS was reimbursed in the amount it customarily received from defendants. Essentially, HPTS instituted this action as a test case on behalf of its patients in order to establish its own right to charge the maximum fees allowed under the PIP fee schedules. Hence, the individual plaintiffs would not be affected in any way by a denial of counsel fees to HPTS; rather an award of counsel fees would reward HPTS for testing the limits of N.J.A.C. 11:3-29.

*392 IV.
On cross-appeal, HPTS contends that the trial court erred in finding that it misapplied the multiple reduction formula during the third billing period. This finding was based on the court's acceptance of defendants' position that the April 6, 1992, amendment to N.J.A.C. 11:3-29.4(f) was merely a clarification of the regulation as originally enacted. HPTS argues that the amendment was a material and significant change to the original regulation and thus required compliance with the Administrative Procedures Act, N.J.S.A. 52:14B-1 to -15(APA) and should not have been given retroactive effect. As earlier discussed, the amendment required physical therapy providers to reduce their billing rates for multiple procedures performed during the same visit regardless of whether the procedures were performed on the same or different body regions.
As adopted in November 1990, N.J.A.C. 11:3-29.4(f) provided:
When multiple procedures are performed in the same body region by the same provider at the same time, it is virtually never appropriate for the fee to be the sum of the fees for each procedure. The principal procedure at an operative session shall be paid at 100 percent of the original eligible charge, the second procedure at 50 percent, and, if performed, any additional procedures at a total of 25 percent of the charge. However, if two or more providers in different specialties perform procedures or if one provider performs multiple procedures on different body regions, each individual provider, or each individual body region procedure[,] may be reimbursed separately. For purposes of such billing, the body shall be divided into: head (including skull and brain); face; neck; chest; abdomen; and pelvic regions. In addition, the extremities shall be subdivided into right and left, upper arm, forearm, wrist and hand; and thigh, lower leg, ankle and foot. Nothing in this subchapter shall be construed to prevent PIP insurers from paying only reasonable and appropriate fees when multiple procedures are performed at the same time or multiple services provided during the same medical visit.

[22 N.J.R. 3811-12 (Dec. 17, 1990) (emphasis added).]
At the time the rule was proposed, a "medical visit" was applicable to physiotherapy services, see 21 N.J.R. 842-43 (Apr. 3, 1989). Thus, there was an ambiguity as to whether the term "operative session" referred only to surgical procedures or to any medical visit, including physiotherapy services.
*393 In November 1991, after the regulation had been in effect for approximately ten months, the Commissioner proposed amendments, which were adopted in the following form, effective April 6, 1992:
(f) The following shall apply to multiple treatment procedures:
1. When multiple procedures are performed on the same patient by the same provider at the same time or during the same visit, it is virtually never appropriate for the fee to be the sum of the fees for each procedure. The principle procedure at a single session shall be paid at 100 percent of the eligible charge, the second procedure at no more than 50 percent of the upper limit on the fee schedule for that particular procedure, and if performed, any additional procedures at no more than 25 percent of the upper limits on the fee schedule for those particular procedures....
2. If two or more providers in different specialties perform procedures or if one provider performs multiple procedures on different body parts or regions, each individual provider, or each individual body region or body part procedure may be reimbursed separately. For purposes of such billing, the body shall be divided into: head (including skull and brain); face; neck; chest; abdomen; back; and pelvic regions. In addition, the extremities shall be subdivided into right and left: upper arm, elbow, forearm, wrist and hand; and thigh, knee, lower leg, ankle and foot. This reference to specific body parts or regions is included as a guideline to be used in billings for operative and surgical procedures. It is not intended to apply to nor should it be used in connection with billings submitted for nonsurgical or physiotherapy type services provided during the same visit except as a means of describing the treatment rendered.

3. Nothing in this subchapter shall be construed to prevent PIP insurers ... from paying only reasonable and appropriate fees when multiple procedures are performed at the same time or multiple services provided during the same visit.
[N.J.A.C. 11:3-29.4(f) (emphasis added).]
When the Commissioner proposed the amendments he stated three separate times  in the "Summary," the "Social Impact" statement, and the "Economic Impact" statement  that the amendments were intended to "clarify" the application of the multiple reduction formula. 23 N.J.R. 3203-04 (Nov. 4, 1991). In the Social Impact statement, he said: "The proposed amendments to the multiple procedures language, at N.J.A.C. 11:3-29.4(f), in particular, are intended to clarify provisions that have been subject to varying interpretations and considerable confusion on the part of insurers and providers  often leading to unfair and unexpected results." Id. at 3204. In his response to a comment on the proposed amendments, the Commissioner reinforced the notion of *394 clarification when he said, "Language has been added to the last sentence of N.J.A.C. 11:3-29.4(f)2 to clarify that the body parts language is not applicable to nonsurgical or physiotherapy type services or procedures except as a means of describing the treatment rendered." 24 N.J.R. 1347 (Apr. 6, 1992).
Although N.J.A.C. 11:3-29.4(f) as originally adopted included some ambiguous language, the Commissioner's comments show that the Department always intended the multiple reduction formula to be applied separately to different body regions only for surgical or operative procedures. The amendment was a clarification of the original rule, not a material change; thus, it did not require compliance with APA new rule-making procedures. See Society for Envtl. Economic Dev. v. New Jersey Dep't of Envtl. Protection, 208 N.J. Super. 1, 8, 504 A.2d 1180 (App.Div. 1985). Furthermore, as a clarification of a regulation that did not change the intended scope of the original regulation, retroactive application was appropriate. See Kendall v. Snedeker, 219 N.J. Super. 283, 287, 530 A.2d 334 (App.Div. 1987).
We conclude the trial court correctly found that HPTS misapplied the multiple procedures reduction formula in Period III. Thus, for purposes of determining the maximum limit for fees chargeable by HPTS, the multiple procedures reduction formula should be applied to multiple procedures, regardless of whether the procedures are performed on the same or different body parts.
With the exception of paragraph three, the judgment is reversed and the matter remanded for further proceedings consistent with this opinion. With respect to the cross-appeal, we affirm paragraph three of the judgment.
NOTES
[1] The six plaintiffs are Tito Cobo, David Carreno, Norma Cantos, Jose Fernandez, Lydia Rivera and Kesha Finley.
[2] At the time of trial HPTS had filed thirty-five actions seeking similar relief to that sought in the six test cases and represented it had approximately 510 more claims against defendants for policies serviced by Warner/MDA. These thirty-five additional actions were also consolidated with the six test cases for purposes of discovery and management. The record reflects that defendants have four other servicing carriers which had reimbursed HPTS for similar claims but were not named as defendants in this action.
[3] The regulations were first promulgated as emergency rules on November 26, 1990 which became effective on January 1, 1991, 22 N.J.R. 3809 (Dec. 17, 1990), and were adopted as regulations on January 25, 1991, 22 N.J.R. 536 (Feb. 19, 1991).
[4] Under the multiple procedures reduction formula, the principal procedure is reimbursed at 100% of its eligible charge, the second procedure at no more than 50% of the upper limit on the fee schedule, and any additional procedures at no more than 25% of the upper limit. N.J.A.C. 11:3-29.4(f)1.
[5] The PIP fee schedule lists numerous physical modalities and procedures and their fees associated therewith, such as hot/cold packs, electrical stimulation, ultrasound, manipulation, therapeutic exercise, whirlpool, etc.
[6] Both Grace DiMaya, HPTS' billing supervisor, and Alan Trachtenberg, comptroller and son of the owner of HPTS, explained that when patients were insured through PIP carriers, with major medical carriers as the secondary insurers, the deductibles or co-payment portion of the bills unpaid through PIP carriers would have to be submitted to the major medical carriers, necessitating a retyping of the bills listing the modalities performed during each treatment session. This retyping of bills took time and resulted in a billing backlog. Therefore, HPTS claimed it changed to a modality-based billing method to conform to the method utilized by the secondary insurers.
[7] Jane Benyak testified that providers could request additional reimbursement if they were able to document extenuating circumstances, but under cross-examination she could not point to any claims for which more than $60 was allowed.
[8] We note the trial court improperly bifurcated the issue of the amount of the counsel fees from its determination that HPTS is entitled to such fees. R. 4:42-9(d). We also observe that certification of the judgment as final was contrary to R. 4:42-2 because it was certified solely for the purpose of achieving interlocutory review. We disapprove of both these procedures. We note, however, that just prior to the issuance of this opinion, we received a copy of an order dated July 23, 1996 setting forth the exact amount of the fees awarded.