693 A.2d 1214

HARRY NESTER AND MARY NESTER, PLAINTIFFS–APPELLANTS, AND MDN, INC., PLAINTIFF, v. JAMES D. O'DONNELL, SR. AND CROSS WIRE CLOTH AND MANUFACTURING COMPANY, INC., A NEW JERSEY CORPORATION, DEFENDANTS–RESPONDENTS.

JAMES D. O'DONNELL, IRA, AND DEFINED PENSION PLAN, THIRD–PARTY PLAINTIFFS–RESPONDENTS, v. MDN, INC., THIRD–PARTY DEFENDANT, AND HARRY W. NESTER AND MARY NESTER, THIRD–PARTY DEFENDANTS–APPELLANTS.

JAMES D. O'DONNELL, SR., PLAINTIFF–RESPONDENT, v. HARRY W. NESTER AND MARY T. NESTER, DEFENDANTS–APPELLANTS, AND MDN, INC., DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued April 16, 1997—Decided May 22, 1997.

Before SHEBELL, BAIME and PAUL G. LEVY, JJ.

*Ronald L. Glick* argued the cause for appellants Harry W. Nester and Mary D. Nester (*Archer & Greiner, P.C.,* attorneys; *Leigh J. Bove,* on the brief).

*John R. Mininno* argued the cause for respondents James O'Donnell, Sr., IRA, Defined Pension Plan and Cross Wire Cloth and Manufacturing Company, Inc. (*Cahill, Wilinski & Cahill, P.C.,* attorneys; *Mr. Mininno,* on the brief).

The opinion of the court was delivered by

PAUL G. LEVY, J.A.D.

Plaintiffs (the Nesters) purchased defendants' (O'Donnell and/or Cross Wire) wire mesh business in 1985 for more than $1 million. Terms of the sale were stated in a contract made on October 15, 1985. The buyer's obligations were secured by two promissory notes and one mortgage note. Shortly before the two promissory notes were set to balloon on December 15, 1992, Harry Nester attempted to restructure the financing. When negotiations failed, plaintiffs ceased making payments and sued defendants for breach of contract on January 13, 1993.

They allege they discovered, some seven years later, that defendants had regularly engaged in a practice of substituting lower grades of stainless steel than was ordered by customers, while billing for the more expensive material originally ordered. They sued defendants in January 1993, seeking to rescind the various contracts and promissory notes related to the original purchase and compensatory damages. Defendants raised the six year statute of limitations for contractual claims as an affirmative defense and counterclaimed for payment of the balances on the first promissory note and the balance due on the mortgage notes. Included in the answer was a third-party complaint for the unpaid balance on the second promissory note due to O'Donnell's succeeding interest in Cloth Wire's pension plan fund. The three notes each provided that a default on one would accelerate the balance due on the others. Plaintiffs answered the counterclaim and third-party complaint by asserting the fraudulent acts alleged in their complaint as well as the right of setoff. Later they moved to amend their answer to also claim the right of recoupment.

Two years later, O'Donnell filed a separate action for foreclosure of a purchase money mortgage. Defendants answered claiming nothing was due because they had a right to setoff what was owed them for O'Donnell's fraud in the inducement of the original contract. They also counterclaimed for discharge of the mortgage on the basis that they were only accommodation makers. The two actions were consolidated.

Defendants moved for summary judgment on the original complaint based on the statute of limitations. The General Equity judge held a hearing, expressed his rulings in a written opinion and dismissed the complaint by order of May 2, 1995. In October 1995, defendants moved for partial summary judgment on the remaining issues, based of O'Donnell's June 1995 amendment of his complaint in foreclosure and counterclaim and third-party complaint to the original action; the motion was for judgment on the unpaid balances on the three notes in default. The Nesters filed a cross-motion seeking to amend the pretrial order to clarify

the nature of their claims and include the defense of recoupment. On December 21, 1995, an order was entered in favor of O'Donnell, specifying that the Nesters were not accommodation makers but primary obligors on the two promissory notes, the counterclaim to the foreclosure complaint was dismissed, the Nesters were held in default under the mortgage note and both of the promissory notes, and the cross-motion to amend the pretrial order was denied. The judge reasoned that the time limit barring plaintiffs from asserting their direct claims against defendants also barred them from asserting the defenses of setoff and recoupment to the counterclaim. On March 26, 1996, final judgment of $539,370.43 plus post-judgment interest and attorneys fees was entered against Harry and Mary Nester, individually.[1]

On appeal, plaintiffs contend they should have been permitted to assert the affirmative defenses of setoff and recoupment and they were only accommodation makers of the notes, not direct borrowers, and therefore not personally liable. Additionally, they claim the judge erred in applying the six-year time limit, since they could not have discovered the basis of their claim for fraud until after the statute of limitations had expired. We agree with the judge that plaintiffs were not accommodation makers, and we also conclude the record supports the judge's ruling that applied the statute of limitations and dismissed their complaint. However, we disagree with the judge's finding as to the right of plaintiffs to defend the separate claims for default on the promissory notes asserted in O'Donnell's counterclaim and third-party complaint by seeking recoupment. Therefore we affirm in part and reverse in part.

## I. The Period of Limitations

The essence of plaintiffs' claim is that defendants engaged in fraud by overstating the value of the business at the time of the

---

[1] Entry of final judgment in the foreclosure action has been stayed by the Bankruptcy Court.

sale. This occurred because defendants failed to inform plaintiffs that they regularly substituted one type of metal for another when they shipped goods to their customers, without the customers' consent. As a result, customers were overcharged, leading to inflated revenues and profits.

Before the contract was finalized and executed, Harry Nester engaged in a due diligence process. Nester and O'Donnell had numerous discussions as to what the business was, how it operated, who they sell to, how many customers there are, where they get their materials, what they do with the materials, what the costs are in operating the business, how things are inventoried, and other financial information as to what costs and sales and profits would be. Nester learned some of this information orally and some in writing. The due diligence activities were conducted on Sundays and after hours because O'Donnell did not want his employees or customers to know the business was for sale. Nester testified he felt competent investigating the financial records on his own rather than hiring an accountant to do so. He reviewed a sampling of invoices "to test to see if it was reasonable to assume that the gross profit stated on Mr. O'Donnell's financial statements was reasonable." He looked at the invoices and the job file and cataloged the information on a spreadsheet on his computer. Nester's on-site investigation lasted for seven days.

Plaintiffs acknowledge the limitations period for fraud is six years. *N.J.S.A* 2A:14–1. However, they claim they did not become aware of defendants' fraudulent activity until November 1992, and under the discovery rule, the statute of limitations should not begin to run until that date.

In general, the discovery rule "provides that in an appropriate case a cause of action will be held not to accrue until the injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim." *Lopez v. Swyer,* 62 *N.J.* 267, 272, 300 *A.*2d 563 (1973). "The burden of proof will rest upon the party claiming the indulgence of the rule." *Id.* at 276, 300 *A.*2d 563. The

discovery rule is called into play "when a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another." *Tevis v. Tevis*, 79 *N.J.* 422, 432, 400 *A.*2d 1189 (1979). As stated in *Lynch v. Rubacky*, 85 *N.J.* 65, 424 *A.*2d 1169 (1981), "the discovery rule centers upon an injured party's knowledge concerning the origin and existence of his injuries as related to the conduct of another person." *Id.* at 70, 424 *A.*2d 1169.

Accordingly, the judge conducted a *Lopez* hearing to determine whether the statutory time limit should be stayed because plaintiffs alleged they did not become aware of defendants' fraudulent activity until November 1992. In his written opinion, the judge pinpointed the testimony from which he concluded that "Nester knew about substitutions, ... such knowledge was prior to acquisition and, most assuredly, no later than one month after Nester's acquisition of the business." Contrary to the limited opinions offered by Nester's expert witness, a certified public accountant, the judge found that Nester could have ascertained that the substitution of materials would adversely impact on the value of the business. Rejecting Nester's protestations as "ring[ing] hollow in the ears of this court," the judge determined the substitutions must not have caused any "real harm" because "Nester operated this business for seven years, and if there has been no change in the business which would have put him on further notice to make inquiry, then there must not have been any impact." Additionally, the judge examined Nester's motivation for bringing the rescission action, related to a down turn in business revenues. Finally, the judge concluded Nester had not acted prudently in his due diligence efforts. Therefore, not persuaded by plaintiffs on the discovery question, he held the claim for fraud was viable only from October 15, 1985, until October 15, 1991.

Plaintiffs claim the judge erred in finding that Harry Nester knew of the substitutions no later than one month after acquisition. Instead, plaintiffs contend they did not learn of the substitu-

tions until November 1992 when Harry Nester asked an employee, Thomas Wood, to reinvestigate the business records. They claim no facts existed prior to that time which could have put them on notice as to the alleged fraud claim.

Findings of a trial court should be affirmed if supported by sufficient credible evidence in the record. *Rova Farms Resort v. Investors Ins. Co.*, 65 *N.J.* 474, 484, 323 *A*.2d 495 (1974). *See also Cobo v. Market Transition Facility*, 293 *N.J.Super.* 374, 383, 680 *A*.2d 1103 (App.Div.1996). Here there are sufficient facts to support the judge's finding. First, Harry Nester testified he overheard Thomas Wood, an employee, say he was going to substitute type 304 steel for type 316. This conversation occurred approximately one month after the Nesters acquired the business. Nester explained that when he overheard Wood's statement, he questioned him and told him not to make substitutions in the future. Next, Christopher Robinson, another employee, testified about a conversation in which Nester told him not to make any more substitutions, although Robinson could not recall when the conversation occurred. Further, when another employee, Robert Lucky, was asked whether he and Nester had discussed substitutions, he responded, "I'm sure somewhere across the line that that was broached, yes." The judge noted that Lucky and Robinson no longer worked for the business and had no bias or interest in the outcome of the case, and he gave credence to their testimony.

In addition, the judge considered Nester's purchase of a testing kit used to detect type 316 metal. The judge noted the kit was purchased on November 7, 1985, approximately three weeks after plaintiffs acquired the business, and considered this date significant. "When this testimony [the kit's date of purchase] is added to that of witness Lucky, the date shifts precipitously toward the period of time prior to acquisition."

Finally, the judge considered defendant O'Donnell's testimony that he and Nester discussed the substitutions on several occasions, including during Nester's due diligence and at a lunch meeting sometime in November or December 1985. This evi-

dence, in the aggregate, was sufficient for the judge to conclude that Nester was aware of the practice of substituting materials before he agreed to the acquisition of Cross Wire and certainly within the first month.

Accordingly, we conclude there is sufficient credible evidence in the record to support the dismissal of the complaint.

## II.  Recoupment and Setoff

When O'Donnell filed his third-party complaint seeking payment under the promissory notes and foreclosure on the property, the Nesters asserted the defense of setoff in their answer to the complaint.  This right to setoff is provided in the promissory notes and the contract.  However, as explained *infra*, while the factual basis is the same, the legal defense of setoff differs slightly from that of recoupment.  Thus, when defendants moved for summary judgment as to the foreclosure action in October 1995, plaintiffs cross-moved to amend the pre-trial order "to clarify the claims against O'Donnell and/or Cross Wire previously asserted in the Answer," presumably meaning to add the recoupment defense in addition to the setoff defense.

The judge did not discuss recoupment when he ruled on these motions, and he dismissed the claim for setoff as controlled by the direct claim for fraud which had been declared time barred.  That decision concentrated on whether the Nesters were direct obligors or merely accommodation makers on the notes, discussed *infra.*

Plaintiffs sought to amend the pre-trial order to add recoupment as a defense in addition to setoff.  In that way, plaintiffs would be able to recover the deficiency in sales attributable to the secreted information about substitutions of goods sold, to the extent they still owed a balance to O'Donnell on the promissory notes.  "[T]he fundamental purpose of recoupment ... is the examination of the transaction in all its respects to achieve a just result." *Beneficial Finance Co. v. Swaggerty,* 86 *N.J.* 602, 612, 432 *A.*2d 512 (1981).  "Recoupment is distinguishable from setoff in that the latter involves an affirmative recovery on a claim that

may be independent of the transaction upon which the plaintiff's claim is based. While recoupment may be utilized only to reduce or extinguish the plaintiff's recovery, setoff may be awarded for any amount to which defendant is entitled." *Ibid.* at 609, 432 *A.*2d 512. A successful recoupment defense acts to reduce the amount the plaintiff can recover on the claim for the debt when the counterclaim arises from the same transaction. *Id.* at 611, 432 *A.*2d 512. While recoupment may reduce the amount due on the debt to zero, it does not invalidate the plaintiff's claim. *Ibid.*

Most significantly, the defense of recoupment "is never barred by the statute of limitations so long as the main action itself is timely." *Beneficial Finance Co. v. Swaggerty, supra,* 86 *N.J.* at 609, 432 *A.*2d 512, quoting *Bull v. United States,* 295 *U.S.* 247, 262, 55 *S.Ct.* 695, 700, 79 *L.Ed.* 1421, 1428 (1935). In another case, a bank's motion for summary judgment was denied when the borrower set forth a counterclaim for equitable recoupment, even though the recoupment claim would have been barred under the statute of limitations had it been brought as an affirmative action. *Midlantic National Bank v. Georgian, Ltd.,* 233 *N.J.Super.* 621, 559 *A.*2d 872 (Law Div.1989). The court explained, "[a]lthough the defendants may not raise this cause of action as a sword against [the lender,] they may raise it as a shield by way of counterclaim if the counterclaim sets forth a cause of action in equitable recoupment." *Id.* at 625, 559 *A.*2d 872.

Similarly, in *Gibbins v. Kosuga,* 121 *N.J.Super.* 252, 296 *A.*2d 557 (Law Div.1972), the court permitted defendants to raise the recoupment defense although it would have been barred by the statute of limitations had it been raised affirmatively. Although defendants failed to include the defense in the pretrial order, the court allowed the order to be amended, explaining while "[t]he court is not unmindful of the importance of the pretrial order, . . . [p]resumably mandatory rules can be relaxed when 'enforcement would be inconsistent with substantial justice.'" *Id.* at 259, 296 *A.*2d 557.

The Nesters stopped making payments to O'Donnell in November 1992 and O'Donnell filed his third-party complaint in February 1993. While the Nesters would not be permitted to raise recoupment by amendment to their untimely complaint, they may raise it as an affirmative defense to the third-party action. O'Donnell's third-party complaint was timely filed, and the recoupment defense will not be barred by the statute of limitations. Further, *R.* 4:9–2 and the case law provide that courts should allow pretrial orders to be amended liberally.

■ Accordingly, because the recoupment defense is not barred by the statute of limitations and a factual issue exists as to whether recoupment is appropriate, the cross-motion to amend the pretrial order should have been granted and defendants' summary judgment motion denied. In that respect, we reverse and remand for further proceedings in the third-party action.

### III. *Liability on the Notes*

■ Defendants moved for summary judgment, asserting no factual issues existed and they were entitled to payment under the promissory notes and to foreclosure on the property as a matter of law. In response, the Nesters claim a factual issue exists as to whether the language in the promissory notes and contract is ambiguous and whether they signed the documents as accommodation makers rather than principals. (The mortgage and mortgage note were made only by the Nesters, and there is no question they were directly liable for any default thereunder.) According to them, the intent of the parties was for MDN, Inc. to be principally liable on the promissory notes and Harry and Mary Nester to be accommodation makers. They further maintain that because O'Donnell failed to file a Continuation Statement when the financing statement lapsed after five years, the security interest was no longer perfected; without perfection, the value of the collateral was impaired and their obligation to pay as accommodation makers was discharged.

"Whether a term is clear or ambiguous is . . . a question of law." *Kaufman v. Provident Life and Cas. Ins. Co.,* 828 *F.Supp.* 275, 282 (D.N.J.1992), *aff'd,* 993 *F.*2d 877 (3d Cir.1993). "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations. . . . To determine the meaning of the terms of an agreement by the objective manifestations of the parties' intent, the terms of the contract must be given their 'plain and ordinary meaning.' " *Id.* at 283. "A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together." *Barco Urban Renewal Corp. v. Housing Auth. of Atlantic City,* 674 *F.*2d 1001, 1009 (3d Cir.1982) (citing *Restatement (Second) of Contracts* § 202(2) (1981)). A "court should not torture the language of [a contract] to create ambiguity." *Stiefel v. Bayly, Martin & Fay, Inc.,* 242 *N.J.Super.* 643, 651, 577 *A.*2d 1303 (1990). "In the quest for the common intention of the parties to a contract, the court must consider the relations of the parties, the attendant circumstances, and the objects they were trying to attain." *Anthony L. Petters Diner, Inc. v. Stellakis,* 202 *N.J.Super.* 11, 27, 493 *A.*2d 1261 (App.Div.1985).

Each promissory note states it is given by "MDN, INC., herein singly referred to as the 'Borrower,' HARRY NESTER and MARY NESTER, all of which are herein collectively referred to as the 'Undersigned,' [who] jointly and severally promise to pay" the amounts involved. The underlying contract was made by Cross Wire and O'Donnell as "Seller" and "HARRY NESTER and MARY NESTER, his wife, *OR* their corporate nominee MDN, INC." as "Buyers." According to the Nesters this language is ambiguous, creating a question of fact, and summary judgment should not have been granted. The judge found to there was no ambiguity and rejected defendants' claims to the contrary. He stated:

> It is the opinion of the Court, . . . that those notes are unambiguous. There was a promise to pay, an unambiguous promise to pay, and the words the undersigned does not create in the mind of the Court any ambiguity at all even though the note said as to . . . MDN singly referred to as borrower and then went on to mention

Harry Nester and Mary Nester. Then it uses a word collectively, jointly and severally promised to pay. To this Court that is an unambiguous promise to be primarily obligated to pay the sum stated in the instruments.

As such, the judge determined the Nesters were not accommodation makers, dismissed their counterclaim with prejudice, deemed them in default under the promissory notes and the mortgage note, as a result of the cross-default provisions in each document, and granted summary judgment.

The Nesters each signed the notes as a "co-maker" and there is nothing indicating the notes were executed in any other capacity. There is no language in either note indicating they were acting as guarantors or in any way lending their credit to MDN. The governing provisions of Uniform Commercial Code in effect at the time of this transaction defined a maker as "a person who signs or is identified in a note as a person undertaking to pay." *N.J.S.A.* 12A:3–103a(5). An accommodation party was defined as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." *N.J.S.A.* 12A:3–415(1). If words of guaranty were added to the signature of one of two or more makers of a note, such language "create[s] a presumption that the signature is for the accommodation of the others." *N.J.S.A.* 12A:3–416(4).

The Code is essentially the same today, but more clearly states the applicable principles. *N.J.S.A.* 12A:3–419, now titled "Instruments signed for accommodation," provides:

a. If an instrument is issued for value given for the benefit of a party to the instrument ("accommodated party") and another party to the instrument ("accommodation party") signs the instrument for the purpose of incurring liability on the instrument without being a direct beneficiary of the value given for the instrument, the instrument is signed by the accommodation party "for accommodation."

b. An accommodation party may sign the instrument as maker, drawer, acceptor, or indorser and, subject to subsection d. of this section, is obliged to pay the instrument in the capacity in which the accommodation party signs. The obligation of an accommodation party may be enforced notwithstanding any statute of frauds and whether or not the accommodation party receives consideration for the accommodation.

c. A person signing an instrument is presumed to be an accommodation party and there is notice that the instrument is signed for accommodation if the signature is an anomalous indorsement or is accompanied by words indicating that the signer is

acting as surety or guarantor with respect to the obligation of another party to the instrument. Except as provided in 12A:3–605, the obligation of an accommodation party to pay the instrument is not affected by the fact that the person enforcing the obligation had notice when the instrument was taken by that person that the accommodation party signed the instrument for accommodation.

[*L.* 1995, *c.* 28, § 1, eff. June 1, 1995.]

The status of the corporation and the individuals is simply what is shown in the note. *Polhemus v. Prudential Realty Corp.,* 74 *N.J.L.* 570, 67 *A.* 303 (E. & A.1907). Joint and several liability is a common phrase, easily understood. It means the parties are "responsible together and individually." *Black's Law Dictionary* 823 (5th ed.1979). Further, "the injured party may sue some or all of the defendants together, or each one separately, and may collect equal or unequal amounts from each in satisfaction of his damages." *Barron's Law Dictionary* 255 (3d ed.1991). The judge deemed the phrase "jointly and severally liable" to be unambiguous and decided as a matter of law the Nesters were primarily obligated, as was MDN, Inc., to pay the sum stated in the instruments. We conclude the Nesters were not accommodation makers of the notes.

Therefore, we affirm that part of the order of December 21, 1995 granting summary judgment to O'Donnell and Cross Wire, rejecting the Nesters' claim to be accommodation makers and dismisses their counterclaim on the mortgage foreclosure.

In sum, plaintiffs waited too long to seek rescission of the contract and compensatory damages for fraud. However, to the extent they left unpaid balances on the promissory notes, they could assert the fraud as an affirmative defense to the counterclaim and third-party action. If O'Donnell prevails, all third-party defendants, corporate and individual, will be liable, except as limited by the bankruptcy action.

Affirmed in part and reversed and remanded in part for trial of plaintiff's claim for recoupment.