provisions and any other appropriate matters can be dealt with upon remand.

Of course, we express no comment on whether or not Vasys or CAL breached any duty to Lucier and Haley under their agreement. Our holding here is only that if they are liable, the extent of any damages for which they should be liable is not limited by the terms of the contract.

The order of May 11, 2001 is affirmed. The order of January 5, 2001 is reversed. The matter is remanded for further proceedings. We do not retain jurisdiction.

841 A.2d 917

SEAVIEW ORTHOPAEDICS ON ASSIGNMENT FROM FRANCES FLEMING, PLAINTIFF–APPELLANT, v. NATIONAL HEALTHCARE RESOURCES, INC., D/B/A NHR, AS THIRD PARTY VENDOR/ADMINISTRATOR FOR ALLSTATE INDEMNITY COMPANY D/B/A ALLSTATE AND ALLSTATE INDEMNITY COMPANY D/B/A ALLSTATE AND CONSUMER HEALTH NETWORK, D/B/A CHN, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 12, 2003—Decided February 13, 2004.

502

Before Judges SKILLMAN, COBURN and FISHER.

*Stephen A. Gravatt,* argued the cause for appellant (*Mr. Gravatt,* on the brief).

*Curtis J. Turpan,* argued the cause for respondent, National Healthcare Resources (*Harwood Lloyd, LLC,* attorneys; *Mr. Turpan,* of counsel and on the brief).

*David J. Klinger,* argued the cause for respondent, Allstate Indemnity Company (*Gutterman, Markowitz & Klinger,* attorneys; *Frank W. Farrell,* on the brief).

*Thomas P. Weidner,* argued the cause for respondent, Consumer Health Network (*Windels, Marx, Lane & Mittendorf,* attor-

neys; *Mr. Weidner*, of counsel; *David F. Swerdlow* and *Jennifer Stefanick*, on the brief).

The opinion of the court was delivered by

FISHER, J.A.D.

Plaintiffs are medical service providers who, in the forty cases before us,[1] claim defendants Allstate Indemnity Company (Allstate) and National Healthcare Resources (NHR) wrongfully "under-reimbursed" for treatment plaintiffs rendered to various auto accident victims. Allstate and NHC (Allstate's claims administrator) reimbursed pursuant to rates set forth in plaintiffs' contract with defendant Consumer Health Network (CHN) and not pursuant to the maximum rate allowed by the PIP medical fee schedule set forth in *N.J.A.C.* 11:3–29.1. Plaintiffs sought damages for the difference in the two rates.

The cross-motions for summary judgment, which led to the dismissal of the complaints in these matters, required a determination as to whether the CHN contract is enforceable. Plaintiffs claim that the CHN contract should not be enforced because it lacked consideration, is inequitable or unfair, and violates our no-fault laws (*N.J.S.A.* 39:6A–1 to 35). We agree with the motion judge that plaintiffs' arguments are without merit and affirm the entry of summary judgment in these cases.

Because these matters were adjudicated by way of summary judgment, our review is based upon the same standard which bound the motion judge. In the absence of any genuine issues of material fact, we must determine whether the judge's legal conclusions are correct. *Prudential Prop. Ins. v. Boylan*, 307 *N.J.Super.* 162, 167, 704 *A.2d* 597, 599–600 (App.Div.1998); *Kopin v. Orange Prods., Inc.*, 297 *N.J.Super.* 353, 366, 688 *A.2d* 130, 136 (App.Div.), *certif. denied*, 149 *N.J.* 409, 694 *A.2d* 194

---

[1] This appeal seeks our review of orders granting summary judgment in favor of defendants in the above-captioned matter and thirty-nine other suits. We previously granted plaintiffs permission to file one appeal for all forty cases.

(1997). The parties conceded in the trial court that the matter was ripe for summary judgment, the motion judge agreed, and we are likewise satisfied that there were presented no material factual disputes and that the questions raised on appeal require an application of well-established legal concepts to the unambiguous terms of the CHN contract.

We initially observe that the parties have raised various procedural irregularities in the record both in the trial court and in this court. For example, the motion judge originally indicated that these forty cases would be consolidated and collectively transferred to the Law Division. Later, the judge decided otherwise. Plaintiffs also question whether their amended complaint, which joined CHN, was actually considered by the trial judge. (Plaintiffs did not originally name CHN as a party despite the fact that their claim that the CHN contract is unenforceable constituted the pivotal point in these actions.) We need not review these unnecessarily convoluted circumstances because we find that no prejudice has inured to any party. The motion judge had all necessary parties, including CHN, before him when the cross-motions for summary judgment were considered and each party had a full and fair opportunity to raise all their factual and legal contentions prior to the motion judge's ruling.

In addition, defendants correctly contend that certain issues raised by plaintiffs on appeal were not raised in the trial court. As a result, defendants seek a foreclosure of our consideration of those new issues. However, because we understand that there are many other similar lawsuits currently pending in the trial courts, we deem it important to decide all the questions of law presented regarding the enforceability of the CHN contract, whether or not they were adequately raised in the trial court. *See Alan J. Cornblatt, P.A. v. Barow*, 153 *N.J.* 218, 230, 708 *A.*2d 401, 406–07 (1998).

We lastly note one other procedural peculiarity which warrants consideration. After plaintiffs filed their brief in chief they filed not one, but two, "corrected" briefs, each supplanting its predeces-

sor. In the first of these two "corrected" briefs, plaintiffs argued that Allstate and NHR should be barred from reimbursing pursuant to the CHN fee schedule because they failed to make payments within thirty days as required by section 2.8 of the payor agreement between CHN and NHR. However, when plaintiffs filed their second (and last) "corrected" brief, this argument was absent. We have taken an expanded view of the issues of law before us, due to the importance of providing guidance for the numerous other similar suits now pending, but decline to consider this issue about the timing of the earlier payments because it comes before us on "an insufficient factual basis." *Ibid.; In re Bd. of Educ. of Boonton,* 99 *N.J.* 523, 536, 494 *A.*2d 279, 285 (1985). Accordingly, with the exception of the issue regarding the timeliness of reimbursement, we turn to all the other issues raised on appeal.

The undisputed factual record reveals that plaintiffs are medical providers who rendered services to various auto accident victims. Each of these victims was insured by Allstate which, through its claims administrator, NHR, reimbursed plaintiffs pursuant to the CHN contract and fee schedule. Because the CHN fee schedule imposes lower rates than the PIP fee schedule set forth in *N.J.A.C.* 11:3–29.1, plaintiffs filed these forty lawsuits, seeking to recover damages—in the above-captioned case, plaintiffs claimed $1713.05—representing the monetary difference between the two schedules.

CHN claims to be the largest preferred provider organization (PPO) in New Jersey. According to CHN's unrefuted certification, its network includes over 11,000 physicians, nearly 14,000 medical services providers (which includes not only physicians but also laboratories and hospitals) and has 950,000 enrollees. CHN provides its clients with a PPO network in three distinct areas: workers' compensation, group health benefits and auto insurance. By entering into a contract with CHN, plaintiffs gained potential access to the numerous enrollees in exchange for accepting reimbursement at lesser rates.

■ We reject plaintiffs' initial claim that the contract does not encompass treatment and services rendered for patients who are auto accident victims. The CHN contract states in unambiguous terms that it covers policies of automobile insurance.[2] The contract also contains plaintiffs' agreement to be reimbursed, in such circumstances, only when rendering appropriate and necessary treatment,[3] and at rates no greater than those set forth in the CHN fee schedule.[4] Accordingly, on its face, when treating auto accident victims, the CHN contract limits plaintiffs to payments no greater than those permitted by the CHN fee schedule.

■ Plaintiffs also argue that their agreement to be bound to the CHN rates for auto accident victims is not supported by consideration. It is well-settled that contracts are not enforceable in the absence of consideration, i.e., "both sides must 'get something' out of the exchange." *Continental Bank of Pa. v. Barclay Riding Acad.*, 93 *N.J.* 153, 170, 459 *A.*2d 1163, 1171 (1983). Consideration may take many forms and may be based upon either "a detriment incurred by the promisee or a benefit received by the promisor." *Ibid.* Courts, however, do not inquire into the

---

[2] Section 2.1 of the contract states: " 'Plans' means individual and group health benefit contracts, workers compensation programs, policies of health insurance, *policies of automobile insurance*, health maintenance organization programs or other plans of a Payor which shall be subject to this Agreement" (emphasis added).

[3] Section 5.2.5 of the contract states: "Provider shall accept as full payment from each Payor for the Covered Services deemed Medically Appropriate pursuant to the Utilization Management Program the lesser of charges customarily charged to other patients or the consideration provided in the Fee Schedule. Provider hereby waives any amounts from any Payor and any Eligible Person (i) in excess of the fees customarily charged to other patients or the amounts provided in the Fee Schedule; and (ii) any amount from any Payor or Eligible Person for services performed which have been deemed not to be Medically Appropriate by the Utilization Management Program."

[4] Section 3.1.1 of the contract states: "Provider accepts and is hereby bound by the Standard Terms and the Fee Schedule and shall be bound by any other fee schedule negotiated or renegotiated by CHN, directly or indirectly, with a Payor." *See also* Section 5.2.5 set forth in footnote 3, *supra.*

adequacy of consideration in determining whether to enforce a contract. *American Handkerchief Corp. v. Frannat Realty Co.,* 17 *N.J.* 12, 18, 109 *A.*2d 793, 796 (1954). Any inquiry into the presence of consideration does not depend upon the comparative value of the "things" exchanged. *Tumarkin v. Goldstein,* 33 *N.J.Super.* 46, 50, 109 *A.*2d 435, 437 (App.Div.1954). Instead, when we speak of the need for an exchange of valuable consideration what is meant is that the consideration "must merely be valuable in the sense that it is something that is bargained for in fact." *Borbely v. Nationwide Mut. Ins. Co.,* 547 *F.Supp.* 959, 980 (D.N.J.1981) (quoting 1 *Corbin on Contracts* § 131 (1963)).

■ Here, the contract provided benefits to plaintiffs in a variety of ways which either collectively or separately constituted valuable consideration for plaintiffs' promise to accept the CHN rates for reimbursement from auto accident victims (and other types of patients) and not the maximum rate permitted by the PIP fee schedule. Plaintiffs, for example, obtained the benefit of marketing their businesses in a directory of providers utilized by numerous payors in the workers' compensation and health benefits markets and many thousands of potential patients. Payors make the list available to the largest PPO membership network in New Jersey and, in the health and workers' compensation settings, are generally offered substantial financial incentives when those patients use the providers on the list.

Plaintiffs argue that the likelihood of a provider receiving a referral from the CHN network of an auto accident victim "is practically nil." Defendants dispute this, contending that an auto accident victim, who is in a health benefits or workers' compensation plan that utilized the CHN network, may likely use the same provider that was engaged for these other purposes. This point is, perhaps, debatable. But even if plaintiffs' argument is accurate and the actual benefits received by them in the auto insurance area are illusory, plaintiffs received valuable consideration by being in the network and by obtaining or at least gaining access to patients in the workers' compensation and health benefits areas.

That the predominant (or even exclusive) benefits for providers may come from workers' compensation or health benefit sources does not render the contract unenforceable for lack of consideration when services provided for auto accident victims are reimbursed at a lesser rate. We need not, as plaintiffs argue, find some specific monetary benefit for plaintiffs when called upon to provide services for auto accident victims so long as the other aspects of the contract provide, or have the potential to provide, a benefit to plaintiffs. It is the totality of the exchange of promises and benefits that is considered and, in this case, this exchange was sufficient to create an enforceable contract.

■ Plaintiffs also argue that the CHN contract should not be enforced because it is inequitable or unfair. That is, plaintiffs contend that as a result of their agreement to accept reimbursement for auto accident victims based upon CHN's fee schedule, and because plaintiffs obtain a small or non-existent direct benefit as a result, that CHN has been unjustly enriched and unfairly enjoys "windfall profits." As will be explained later, this result, if true,[5] is entirely consistent with the purposes of the no-fault statutory scheme. But this is not a valid reason for prohibiting enforcement of their contract, since the parties were free to contract as they deemed appropriate, and courts will not rewrite contracts to make better deals for parties than they freely and voluntarily chose to make for themselves. *James v. Fed. Ins. Co.*, 5 *N.J.* 21, 24, 73 *A.2d* 720, 721 (1950); *U.S. Pipe Foundry Co. v. American Arb. Ass'n*, 67 *N.J.Super.* 384, 393, 170 *A.2d* 505, 510 (App.Div.1961).

■ Plaintiffs assert that the CHN contract runs counter to the no-fault laws by (a) limiting their ability to treat patients, (b) requiring them to accept reimbursement in amounts lower than

---

[5] There is no evidence in the record to demonstrate that this aspect of the CHN contract provides CHN with "windfall" profits but we will assume, for purposes of the matter before us, that plaintiffs' claim in this regard is factually accurate.

the rates set forth in the PIP fee schedule, and (c) infringing upon their right to arbitrate with payors.

As to this first aspect, the CHN contract unambiguously declares that it contains nothing which "shall interfere with or in any way alter any provider-patient relationship" and that providers, such as plaintiffs, "shall have the sole responsibility for the care and treatment" of their patients.[6] Accordingly, plaintiffs are not limited in treating their patients in any manner which they deem medically reasonable or necessary. In making this argument, plaintiffs confuse their obligations to their patients with their right to seek reimbursement from others for having rendered treatment.

In short, what plaintiffs are actually arguing is not that defendants are dictating how they should treat their patients but that plaintiffs' desire to be compensated at their customary rates for their services is limited by the CHN contract. It is undoubtedly true that plaintiffs' right to compensation is limited by the CHN contract but, even in the absence of that contract, plaintiffs' right to be fully compensated at their customary usual rates would also be limited by the application of the PIP fee schedule. In essence, plaintiffs have entered into a contract which, when treating auto accident victims, replaces one fee schedule (PIP's) for another (CHN's). Thus, the methodology governing reimbursement would be no different even if plaintiffs had never contracted with CHN. In either instance, plaintiffs may only be reimbursed pursuant to a fee schedule which may very well call for less compensation than what plaintiffs might customarily charge their patients. For that

---

[6] Section 8.1 of the contract states: "Nothing contained in this Agreement shall interfere with or in any way alter any provider-patient relationship and Provider shall have the sole responsibility for the care and treatment of Eligible Persons under Provider's care. Nothing contained herein shall grant CHN or any party performing utilization management the right to govern the level of care of a patient. Utilization management decisions shall only effect reimbursement of Provider for services rendered and shall not limit the performance of the services of Provider or effect Provider's professional judgment."

reason, the methodology imposed by the CHN contract is consistent with the no-fault statutory scheme.

Plaintiffs also argue that CHN's "utilization management decisions" may interfere with their ability to treat patients. Such utilization management decisions, however, are not inconsistent with the plaintiffs' ability to treat their patients, as they and CHN unambiguously agreed; section 8.1 of their contract states: "Nothing contained herein shall grant CHN or any party performing utilization management the right to govern the level of care of a patient." Instead, utilization management decisions "shall only effect reimbursement" and "shall not limit the performance of the services . . . or effect [plaintiffs'] professional judgment."

Plaintiffs are also mistaken to the extent they argue the "care path" established for reimbursement when the patient is an auto accident victim is different from the care path developed for all other patients. We have previously rejected the contention that there is some defect in the care path regulations adopted by the Department of Banking and Insurance in *N.J.A.C.* 11:3-4 and, indeed, concluded that these regulated care paths were intended to be consistent with those available to other types of patients:

> *Appellants also maintain that the care paths develop two sets of standards of medical care—one set for victims of automobile accidents, and a second set for all other patients. The contention is erroneous . . . .*
>
> Regardless of the type of insurance an individual . . . may have, whether a traditional health indemnity policy, HMO coverage, Medicare, or an automobile insurance policy, the patient should not be subject to unnecessary medical treatments or diagnostic tests, or take advantage of overutilization. . . . Limiting medical treatments and tests to those that are medically necessary does not necessarily create a dual standard of medical care. Indeed, *the legislative goal appears to be a single, legitimate standard.*
>
> [*N.J. Coalition of Health Care v. Dep't of Banking and Ins.*, 323 *N.J.Super.* 207, 248–49, 732 *A.*2d 1063, 1087 (App.Div.) (emphasis added), *certif. denied*, 162 *N.J.* 485, 744 *A.*2d 1208 (1999).]

In short, as Judge King said for the court in *N.J. Coalition,* the no-fault laws do "not directly control or regulate medical practice per se but regulate [only] the insurance compensation mechanism." *Id.* at 220, 732 *A.*2d at 1070. That plaintiffs may have further limited their right to reimbursement for the services

rendered to auto accident victims by entering into the CHN contract does not violate the no-fault laws.

We view the essence of plaintiffs' argument to be their regret over having entered into an agreement which contains, as one of its consequences, plaintiffs' agreement to accept less reimbursement than authorized by the no-fault statutory scheme and the applicable regulations for patients who are auto accident victims. Plaintiffs' displeasure over this consequence, however, does not give rise to a legitimate claim that the agreement is inconsistent with the no-fault statutory scheme. By agreeing to accept less from insurers (and, in so doing, requiring patients to make lesser co-payments), the parties to the CHN contract are providing a benefit to insurers and insureds which actually serves, and not disserves, the goals of our no-fault statutory scheme.

A review of the history of the no-fault laws, already thoroughly canvassed by Judge King in *N.J. Coalition, supra,* 323 *N.J.Super.* at 215–23, 732 *A.*2d at 1067–73, and which we will only briefly summarize, demonstrates the lack of merit in plaintiffs' arguments in this regard.

The primary reform of the New Jersey Automobile Reparation Reform Act of 1972, *L.* 1972, *c.* 70, § 4, was to mandate personal injury protection coverage payable to an insured (and family members) for injuries sustained as a result of an automobile accident without regard to "negligence, liability or fault of any kind" of the insured (or family members). *N.J.S.A.* 39:6A–4. Its goal was to compensate "a larger class of citizens than the traditional tort-based system and doing so with greater efficiency at a lower cost." *N.J. Coalition, supra,* 323 *N.J.Super.* at 216, 732 *A.*2d at 1068 (quoting *Emmer v. Merin,* 233 *N.J.Super.* 568, 572, 559 *A.*2d 845, 847 (App.Div.), *certif. denied,* 118 *N.J.* 181, 570 *A.*2d 950 (1989)). This innovation, however, "did not slow the rise in automobile insurance premiums," and caused the Legislature to enact the New Jersey Automobile Insurance Freedom of Choice and Cost Containment Act of 1984, *L.* 1983, *c.* 362, which "introduced the concept of tort options and choice between two mone-

tary thresholds for soft-tissue injuries." *N.J. Coalition, supra,* 323 *N.J.Super.* at 216, 732 *A.*2d at 1068. Notwithstanding these efforts, insurance premiums in New Jersey continued to rise and retained a place among the highest in the United States. *Id.* at 216–17, 732 *A.*2d at 1068–69; *Emmer, supra,* 233 *N.J.Super.* at 573, 559 *A.*2d at 847.

As a result, the statutory scheme was amended in 1988, *L.* 1988, *c.* 119, and again with the adoption of the "Fair Automobile Insurance Reform Act of 1990," *L.* 1990, *c.* 8. These were yet additional attempts "to achieve premium reduction and economy in the no-fault system." *N.J. Coalition, supra,* 323 *N.J.Super.* at 217, 732 *A.*2d at 1068 (citing *Roig v. Kelsey,* 135 *N.J.* 500, 509–10, 641 *A.*2d 248, 253 (1994)). One aspect of the Fair Automobile Insurance Reform Act of 1990 was its rewriting of the fee schedule provisions contained in *N.J.S.A.* 39:6A–4.6 to

> incorporate the reasonable and prevailing fees of 75% of the practitioners [within a region and providing that] [n]o health care provider may demand or request any payment from any person *in excess of* those permitted by the medical fee schedules established pursuant to this section....
>
> [*L.* 1990, *c.* 8, § 7 (emphasis added).]

Still, despite these legislative efforts, New Jersey consumers did not obtain an alleviation from exorbitant insurance premiums.

In 1998, the Automobile Insurance Cost Reduction Act (AI-CRA), *L.* 1998, *c.* 21, was signed into law, making further alterations to the no-fault statutory scheme. The Legislature explained its intent at some length, including the following:

> ... Since the enactment of the verbal threshold in 1988, *the substantial increase in the cost of medical expense benefits indicates that the benefits are being overutilized* for the purpose of gaining standing to sue for pain and suffering, thus undermining the limitations imposed by the threshold and necessitating the imposition of further controls on the use of those benefits, ...
>
> ....
>
> ... To meet these goals, this legislation ... provides for *cost containment of medical expense benefits* through a revised dispute resolution proceeding, provides for a revised lawsuit threshold for suits for pain and suffering which will *eliminate suits for injuries which are not serious or permanent,* ... and *establishes standard treatment and diagnostic procedures against which the medical necessity*

*of treatments reimbursable under medical expense benefits coverage would be judged.*

. . . .

... With these many objectives, the Legislature nevertheless requires that to provide a healthy and competitive automobile insurance market, insurers are entitled to earn an adequate rate of return through the ratemaking process, which shall *reflect the impact of the cost-saving provisions of this act and other recent legislative insurance reforms;* and

... The Legislature has thus addressed these and other issues in this comprehensive legislation designed *to preserve the no-fault system, while at the same time reducing unnecessary costs which drive premiums higher.*

[*N.J.S.A.* 39:6A–1.1 (emphasis added).]

In summary, the principle purposes driving the existing no-fault laws and its prior incarnations are the preservation of the no-fault system, coupled with the limitation or elimination of unnecessary or minor personal injury claims, and the containment of medical costs and expenses which have driven premiums to exorbitant rates in New Jersey. *N.J. Coalition, supra,* 323 *N.J.Super.* at 218, 239, 248–49, 732 *A.*2d at 1082, 1087–88.

In particular, the need to contain medical expenses and its important role in the creation of our no-fault laws informs our decision in the case at hand. As observed in *N.J. Coalition,* "New Jersey has been ranked first nationally in average cost of care for automobile accident injuries, duration of treatment, and number of provider visits." *Id.* at 239, 732 *A.*2d at 1082 (citing 30 *N.J.R.* 3211); *see also N.J.S.A.* 39:6A–1.1 ("It is generally recognized that," among other things, "inappropriate medical treatments . . . ha[ve] increased insurance premiums."). Each step taken by our Legislature in amending the no-fault laws was intended to address cost containment. *See Coalition for Quality Health Care v. Dep't of Banking and Ins.,* 348 *N.J.Super.* 272, 308–09, 791 *A.*2d 1085, 1107–08 (App.Div.) (where *N.J.A.C.* 11:3–4.8, which authorizes insurers to encourage the use of certain vendors for diagnostic testing by imposing co-payments (up to 50% of the cost of the service) on an insured that goes outside the network, was upheld because the regulation is "consistent with AICRA's cost containment goals"), *certif. denied,* 174 *N.J.* 194, 803 *A.*2d 1165 (2002); *N.J. Coalition, supra,* 323 *N.J.Super.* at 247, 732 *A.*2d at 1086

("The physicians' understandable preference for reimbursement for treatment and services without regard to inhibiting standards or guideline constraints is fundamentally and irreconcilably in conflict with AICRA's mandate.").

So viewed, plaintiffs' argument that the CHN contract should not be enforced because it requires them to accept less than their customary rates and less than permitted by the PIP fee schedule, is fundamentally unsound. Plaintiffs' argument is faulty because enforcing their consensual agreement with CHN to accept lesser rates has the salutary effect of causing lower payments to be made by insurers and, a fortiori, lesser co-payments from insureds.[7] This consequence is completely consistent with the Legislature's numerous and prodigious efforts in this area:

> The high costs associated with such alarming figures is initially borne by the State's automobile insurance system and ultimately passed on to the State's consumers. In enacting AICRA, the Legislature was determined to change this situation and to make insurance more affordable.
>
> [*Id.* at 239, 732 A.2d at 1082.]

We also reject plaintiffs' contention that because PPO agreements are not mentioned in the no-fault statutory scheme, the Legislature intended not to authorize—and we should not enforce—such agreements. We see nothing in the no-fault statutory scheme which would suggest the Legislature's antagonism toward any agreement which would have the effect of further reducing the burdens of insurers and insureds. To determine the legitimacy of CHN's rate schedule for auto accident victims, we should not assume the Legislature, through silence, impliedly determined to foreclose their enforcement. Instead, we should consider the

---

[7] It also has a beneficial impact on the available PIP dollars for each insured. For example, if an insured's PIP coverage had a limit of $15,000, and a provider's non-contract rate for a medical procedure was $1000, an insured would have, after that payment, $14,000 in available PIP benefits remaining. However, if, as here, the provider agreed to accept less for the same treatment—for example, $500—then the insured would have $14,500 in available PIP benefits remaining. As a result of the provider's agreement to accept less, the insured realizes a financial benefit in retaining a higher amount of remaining coverage.

purposes of the statutory scheme to determine whether such agreements are permitted.

The legislative purpose of containing medical costs by way of care paths and fee schedules was not to *require* the payment of costs pursuant to those schedules in all instances. Instead, the Legislature intended only to erect a ceiling as to what is reimbursable to providers. *See Thermo. Diagnostics, Inc. v. Allstate Ins. Co.,* 125 *N.J.* 491, 518, 593 *A.*2d 768, 783 (1991) ("[T]he fee schedules promulgated by the Commissioner of Insurance establish maximum fees for a variety of diagnostic-imaging techniques."); *Cobo v. Market Transition Facility,* 293 *N.J.Super.* 374, 384, 680 *A.*2d 1103, 1109 (App.Div.1996) (*N.J.S.A.* 39:6A–4.6 "explicitly establishes the fee schedule rates as a ceiling on reimbursable costs."). A voluntary agreement between a provider and an entity such as CHN, which has the effect of lowering that ceiling, does not run counter to the purposes of the no-fault statutory scheme but, rather, further fulfills its goals.

In seeking to demonstrate that the CHN contract is contrary to public policy, plaintiffs lastly argue that section 5.2.5 of the CHN contract violates the no-fault law's policy in favor of arbitration, *N.J.S.A.* 39:6A–1.1, by inhibiting their right to arbitrate. We reject this contention as well. Section 5.2.5 contains plaintiffs' "waive[r] [of] any amounts from any Payor and any Eligible Person (i) in excess of the fees customarily charged to other patients or the amounts provided in the [CHN] Fee Schedule; and (ii) any amount from any Payor or Eligible Person for services performed which have been deemed not to be Medically Appropriate by the Utilization Management Program." There is nothing in the language of this provision which would suggest that a provider may be prohibited from seeking arbitration of a dispute. Undoubtedly the existence of the CHN contract would render pointless the arbitration of disputes as to what reimbursement would be permitted in accordance with the PIP fee schedule. And it is also true, as defendants contend, that any arbitration award would ultimately be subject to the fee schedule and any other limitations

on reimbursement contained in the CHN contract. But there is no evidence in the record to suggest that any of these parties has attempted to avoid PIP arbitration because of the terms of the CHN contract and, to the extent that PIP arbitration among these parties might be appropriate in a given circumstance, there is nothing in the CHN contract which would bar such a proceeding. Accordingly, we conclude that the premise upon which this particular argument is based is faulty, and we need not further consider whether some limitation or even elimination of a provider's right to arbitrate would compel a holding that the contract, in all other respects, not be enforced-a result we view as unlikely.[8]

For all these reasons, we conclude that a PPO agreement, such as that in question, is entirely compatible with the no-fault scheme because such contracts do not increase but, rather, tend to lessen the monetary obligations of insurers and insureds, a consequence which meets with the legislative intent of containing medical costs, lowering insurance premiums and benefiting New Jersey's consumers. As a result, we reject plaintiffs' contentions in their entirety and affirm the entry of summary judgment dismissing the complaints in these forty actions. We will also affirm the order imposing costs in favor of defendants and against plaintiffs in each action.

---

[8] We observe that the parties to the CHN contract also agreed in section 8.12 that if any of its provisions are found to be "invalid or unenforceable ... the remaining portion or portions shall nevertheless be valid, enforceable and of full force and effect."