**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4909-15T2

RD LEGAL FUNDING PARTNERS,
LP,

     Plaintiff-Respondent,

v.

MEL POWELL, ESQ., and POWELL
LAW FIRM, PC,

     Defendants,

and

JEFFREY C. BOGERT, ESQ., and LAW
OFFICE OF JEFFREY C. BOGERT,

     Defendants/Third-Party
     Plaintiffs-Appellants,

v.

DANIEL OSBORN, ESQ., BEATIE &
OSBORN, LLP, a New York Limited
Liability Partnership, OSBORN LAW,
PC, a New York Professional Corporation,
and OSBORN LAW GROUP,

     Third-Party Defendants-Respondents.

_____

Argued March 28, 2019 – Decided July 29, 2019

Before Judges Simonelli, Whipple and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-000026-15.

Barry Joseph Muller argued the cause for appellants (Fox Rothschild LLP, attorneys; Barry Joseph Muller and Jonathan D. Weiner, of counsel and on the briefs).

Kevin Joseph Musiakiewicz argued the cause for respondent RD Legal Funding Partners, LP (Calcagni & Kanefsky, attorneys; Eric Todd Kanefsky, of counsel and on the briefs; Kevin Joseph Musiakiewicz and Martin B. Gandelman, on the briefs).

Levi & Korsinsky LLP, attorneys for respondents Daniel Osborn, Beatie and Osborn LLP, Osborn Law, PC, and Osborn Law Group (Eduard Korsinsky, of counsel and on the brief).

PER CURIAM

Defendants/third-party plaintiffs Jeffrey C. Bogert, Esq. and the Law Office of Jeffrey C. Bogert (collectively, Bogert) appeal from the March 10, 2016 Chancery Division orders granting summary judgment to plaintiff RD Legal Funding Partners, LP (RD Legal) and third-party defendants Daniel Osborn, Beatie & Osborn, LLP (B&O), Osborn Law P.C. and Osborn Law Group (collectively, Osborn), and dismissing the third-party complaint with

2                                                              A-4909-15T2

prejudice. Bogert also appeals from the May 7, 2018 order denying his motion to vacate judgment.[1] We affirm.

I.

We derive the following facts from the evidence submitted by the parties in support of, and in opposition to, the summary judgment motions, viewed in the light most favorable to Bogert, who opposed entry of summary judgment. Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 135 (2017).

In 2005, Bogert, Osborn and defendants Mel Powell and Powell Law, LC (collectively, Powell) began working as co-counsel in pursuing personal injury

---

[1] Bogert's notice of appeal indicates he also appealed from the April 18, 2016 order denying his motion for reconsideration; however, he did not address this issue in his merits brief. The issue, therefore, is deemed waived. See Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2019). In addition, we consider the trial court's summary judgment decision based solely on the motion record and not based on evidence presented later. Ji v. Palmer, 333 N.J. Super. 451, 463-64 (App. Div. 2000). Accordingly, we will not consider documents submitted or arguments made for the first time on Bogert's motion for reconsideration. See Cummings v. Bahr, 295 N.J. Super. 374, 384 (App. Div. 1996) (a party is not permitted to use a motion for reconsideration as a basis for presenting facts or arguments that could have been provided in opposition to the original motion). Even if we considered the issue, we discern no abuse of discretion in the trial court's denial of the motion, Pitney Bowes Bank, Inc. v. ABC Caging Fulfillment, 440 N.J. Super. 378, 382 (App. Div. 2015), and would affirm substantially for the reasons the court expressed in its written opinion dated April 18, 2016.

A-4909-15T2

claims involving a class of drugs manufactured and sold by Novartis, Merck, and Proctor & Gamble/Aventis. They pursued these claims in three separate multi-district actions, two in the United States District Court for the Southern District of New York and one in the United States District Court for the Middle District of Tennessee (the ONJ Litigations).

Powell primarily collected the cases and referred them to Osborn and Bogert for handling. In December 2005, the parties executed two Fee Agreements, one between B&O and Powell and the other between B&O and Bogert. Under the agreements, Powell would receive forty percent of the attorney's fees derived from the ONJ Litigations and Osborn and Bogert would split the remaining sixty percent based on their relative contributions. At the time, Russell Beatie and Osborn were partners in B&O.

B&O sought to obtain funding from RD Legal to finance the ONJ Litigations costs and expenses. On October 23, 2007, B&O and RD Legal executed a Master Assignment and Sale Agreement (the B&O Agreement). Under the B&O Agreement, RD Legal would provide funding to B&O on an as-needed basis in exchange for B&O's sale and assignment of attorney's fees it derived from the ONJ Litigations (Prospective Fees). Each sale and purchase of

A-4909-15T2

Prospective Fees would be a separate transaction memorialized in a separately executed schedule.

In December 2008, B&O was dissolved and Osborn formed Osborn Law, PC. Beatie and Osborn agreed that Osborn would continue to prosecute ninety-five percent of the ONJ Litigations. On December 31, 2008, Osborn, Bogert and Powell entered into a Fee Agreement, which provided for the same division of attorney's fee as the prior Fee Agreement.

Bogert claimed that on January 6, 2009, he and Osborn met with Roni Dersovitz, the principal and general partner of RD Legal, to discuss RD Legal's continued purchase of Prospective Fees following B&O's dissolution. Bogert alleged the parties agreed that RD Legal would purchase Prospective Fees in an amount sufficient to provide Osborn with approximately $200,000 per month in gross sale proceeds and Osborn, in turn, would pay Bogert $10,000 per month from those proceeds (the Alleged Oral Agreement).

On January 24, 2009, Osborn and Bogert executed a Fee Sharing Agreement, whereby Bogert would continue to act as co-counsel with Osborn in prosecuting the ONJ Litigations, and Osborn would receive sixty-five percent of the attorneys' fees derived from the litigations and Bogert would receive thirty-five percent.

A-4909-15T2

On January 29, 2009, RD Legal and Osborn executed a Master Assignment and Sale Agreement, which contained all of the same material and operative terms of the B&O Agreement (the Osborn Agreement). Osborn also executed an Assumption Agreement, whereby he assumed the obligations B&O incurred in a September 2007 loan and security agreement with RD Legal (the B&O Loan Agreement). Osborn thereafter assigned and sold his Prospective Fees to RD Legal, as required by the Assumption Agreement.

In mid-2009, it became apparent that Osborn and Bogert needed substantial additional funding for the ONJ Litigations. By that time, the total obligations under the B&O and Osborn Agreements had accrued significantly and RD Legal had extended the deadlines associated with each of the schedules issued under the agreements. Due to the significant outstanding balance and the absence of any imminent prospect of a payment, RD Legal agreed to provide continued funding so long as Bogert and Powell executed a Subordination Agreement.

Prior to executing his Subordination Agreement, on September 1, 2009, Bogert obtained a loan in the amount of $63,000 from another litigation funding company, JD Capital LP I (JD Capital), and pledged to JD Capital an interest in the attorneys' fees he would derive from unrelated personal injury actions and

some of the ONJ Litigations. Bogert claimed he notified RD Legal in writing of this transaction, but RD Legal did not respond.

Thereafter, on September 30, 2009, Bogert executed a Subordination Agreement, whereby he agreed to assign, transfer and convey to RD Legal the attorney's fees he derived from the ONJ Litigations in exchange for RD Legal's continued purchase of Prospective Fees from Osborn.[2] Bogert acknowledged in the Subordination Agreement that he

> derives a benefit from the [B&O and Osborn] Agreements and the B&O Loan Agreement and, in consideration thereof, desires to enter into this [Subordination] Agreement in order to further induce RD Legal to enter into and perform under [the B&O and Osborn] Agreements and the B&O Loan Agreement.

Bogert also agreed to the following terms:

1.    TERMS OF SUBORDINATION

1.1    In consideration and conditioned upon the covenants and promises set forth in this Agreement, and in order to induce RD Legal to provide financing to [Osborn] . . . pursuant to the terms of the [B&O and

---

[2] Powell also executed a Subordination Agreement, which was almost identical to Bogert's agreement, except that Powell only assigned the first $1 million in attorney's fees derived from the ONJ litigations and retained the right to terminate his agreement as to RD Legal's future advances of funds to Osborn on or after May 1, 2010.

Osborn] Agreements and the B&O Loan Agreement, Bogert . . . hereby:

1.1.1  assigns, transfers and conveys to RD Legal [Bogert's] portion of all Legal Fees that are at any time due and payable to Bogert . . . under any of the Fee Agreements, in each case as additional collateral securing [B&O's] present and future obligations to RD Legal . . . pursuant to the terms and conditions hereof and of the [B&O and Osborn] Agreements and the B&O Loan Agreement . . . and

1.1.2  subordinates in favor of RD Legal any right, title, interest or lien that Bogert . . . may have or hereafter acquire in [Bogert's] portion of the Legal Fees that are at any time due and payable to [Bogert] under any of the Fee Agreements . . . . Accordingly, such Legal Fees shall be subject and subordinate to the payment in full of all [B&O's] and Osborn['s] Obligations.

. . . .

1.5.  RD Legal may at any time, in its sole and absolute discretion . . . enter into such agreements with [B&O] and [Osborn] as RD Legal may deem desirable without notice to or further assent from [Bogert] and without in any way affecting RD Legal's rights or [Bogert's] obligations hereunder. [Bogert] waives any rights [he] may have to claim that the enforceability of this Agreement may be affected by any subsequent modification, release, extension, or other change, material or otherwise, to any or all of the [B&O and Osborn] Agreements and the B&O Loan Agreement, or in respect of the Obligations.

1.6.  This Agreement is and shall be deemed to be a continuing subordination and assignment, and shall be irrevocable and remain in effect until the

8

Obligations have been indefeasibly paid in full. This is a continuing agreement of subordination and [Bogert] acknowledges that RD Legal may continue, at any time and without notice to [Bogert] to extend financial accommodations for the benefit of [B&O] and [Osborn] on the faith hereof, in such amounts and on such terms and conditions as RD Legal, [B&O] and [Osborn] may agree.

. . . .

11.    ASSIGNMENT; BINDING EFFECT

11.1 . . . RD Legal shall have the right to assign any portion or all of its rights, interests and obligations under this Agreement. RD Legal shall also have the right to pledge or grant a security interest in this Agreement relative to any Legal Fee or Legal Fees.

. . . .

15.    CONFLICTS WITH OTHER AGREEMENTS

15.1. Unless otherwise expressly stated in any other agreement between all or certain of the parties hereto, if a conflict exists between the provisions of this Agreement and the provisions of such other agreement, the provisions of this agreement shall control. . . .

16.    ENTIRE AGREEMENT, AMENDMENT AND WAIVER

16.1  No promises of any kind have been made by RD Legal or any third party to induce [Bogert] to execute this Agreement. No course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement. Only a writing signed by

all parties hereto may amend this Agreement. No failure or delay in exercising any rights hereunder shall impair any such right that RD Legal may have, nor shall any waiver by RD Legal hereunder be deemed a waiver of any default or breach subsequently occurring. RD Legal's rights and remedies herein are cumulative and not exclusive of each other or of any rights or remedies that RD Legal would otherwise have.

[(Emphasis added).]

Bogert alleged he and Osborn agreed that if, as a result of the Subordination Agreement, Bogert was required to repay RD Legal an amount greater than what he received from Osborn under the Alleged Oral Agreement, Osborn would reimburse him for the difference (the Alleged Reimbursement Agreement).

RD Legal claimed that in November 2009, it discovered the transaction between Bogert and JD Capital and demanded that Bogert arrange for JD Capital to remove its lien on the attorney's fees Bogert would derive from the ONJ Litigations. The dispute was not resolved. Bogert claimed that in January 2010, RD Legal instructed Osborn to cease paying him any proceeds from the sale of Prospective Fees to RD Legal.

By the end of 2014, all of the ONJ Litigations had settled, but the litigations did not yield attorney's fees sufficient to cover the funds RD Legal had provided to Osborn. Osborn thereafter transferred all of the attorney's fees

he derived from the ONJ Litigations to RD Legal, but Bogert and Powell did not do so and also did not establish a joint deposit account, as required by their Subordination Agreements.

RD Legal filed a verified complaint against Bogert and Powell asserting claims for breach of contract; conversion; breach of the implied covenant of good faith and fair dealing; breach of fiduciary duty; unjust enrichment; an accounting; and injunctive relief.[3] Bogert filed a counterclaim against RD Legal and third-party complaint against Osborn for declaratory judgment that the Subordination Agreement was void and for breach of the implied duty of good faith and fair dealing. Bogert also sought reimbursement from Osborn pursuant to the Alleged Reimbursement Agreement in the event he had to pay RD Legal an amount greater than the sale proceeds he received from Osborn under the Alleged Oral Agreement.

On February 4, 2016, after the close of discovery, the parties each filed motions for summary judgment. Bogert argued the Subordination Agreement was unenforceable because there was no meeting of the minds or mutual assent to form the Subordination Agreement, and there was a failure of consideration. He maintained that his right to receive a portion of the sale proceeds under the

---

[3]  RD Legal later settled with Powell.

11

Alleged Oral Agreement was the actual bargained-for consideration for the Subordination Agreement, and RD Legal and Osborn breached both agreements by depriving him of that right. He also argued that RD Legal breached the implied covenant of good faith and fair dealing by directing Osborn to stop payment and providing funding to Osborn in an arbitrary and capricious manner.

In a March 10, 2016 written opinion, the court granted summary judgment to RD Legal and Osborn and dismissed the third-party complaint with prejudice. The court found that Bogert signed the Subordination Agreement and the clear language of the agreement established there was a meeting of the minds with respect to its terms. The court also found there was mutual assent because Bogert signed the Subordination Agreement with no changes and failed to submit evidence supporting his claim that he made changes to the agreement.

Addressing consideration, the court noted that Bogert conceded the Subordination Agreement contained no provision regarding his right to receive monthly payments from the sale proceeds. The court reviewed the language of the Subordination Agreement and found the consideration to Bogert was for RD Legal to continue providing funds to Osborn so that Bogert and Osborn could continue to prosecute the ONJ Litigations. The court emphasized:

> Without funding provid[ed] by [RD Legal], [Bogert] and [Osborn] would have been unable to

continue representing their clients in the [ONJ Litigations]. While the [ONJ Litigations] ultimately did not yield [Bogert] and [Osborn] fees sufficient to cover the funds provided by [RD Legal], [Bogert] and [Osborn] were provided the opportunity to prosecute the actions to win these awards and try to win much greater rewards, and that constitutes consideration.

Addressing the Alleged Oral Agreement, the court again noted that Bogert conceded there was no provision in the Subordination Agreement or any other written agreement between the parties regarding that Alleged Oral Agreement. The court reviewed the record and concluded there was no evidence of the Alleged Oral Agreement existed.

The court determined neither RD Legal nor Osborn breached the implied covenant of good faith and fair dealing because there was no evidence the Alleged Oral Agreement and Section 1.6 of the Subordination Agreement expressly permitted the manner in which RD Legal provided funding to Osborn:

> [Bogert] acknowledges that RD Legal may continue, at any time and without notice to [Bogert], to extend financial accommodations for the benefit of [B&O] and [Osborn] on the faith hereof, in such amounts and on such terms and conditions as RD Legal, [B&O] and [Osborn] may agree.

The court thus concluded the Subordination Agreement was enforceable.

As to Bogert's claim against Osborn for reimbursement, the court found there was no evidence the Alleged Reimbursement Agreement existed. The

13

court also found no basis to compel Osborn to contribute to Bogert to what Bogert owed RD Legal.

## II.

Bogert first contends the court erred in granting summary judgment to RD Legal because there were genuine issues of material fact regarding the relationship of the parties, their intentions in entering into the various agreements, and the consideration to Bogert for entering into the Subordination Agreement. Bogert argues the court ignored the parties' course of dealing, failed to consider evidence of the Alleged Oral Agreement, disregarded the context in which the parties' entered into the Subordination Agreement, and ignored certain provisions of the Subordination Agreement that incorporated by reference his Fee Agreement.

Our review of a ruling on summary judgment is de novo, applying the same legal standard as the trial court. Conley v. Guerrero, 228 N.J. 339, 346 (2017). Thus, we consider, as the trial judge did, "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co., 142 N.J. 520, 536 (1995)). Summary judgment must be

granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co., 224 N.J. 189, 199 (2016) (quoting R. 4:46-2(c)).

"To defeat a motion for summary judgment, the opponent must 'come forward with evidence that creates a genuine issue of material fact.'" Cortez v. Gindhart, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting Horizon Blue Cross Blue Shield of N.J. v. State, 425 N.J. Super. 1, 32 (App. Div. 2012)). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Sullivan v. Port Auth. of N.Y. & N.J., 449 N.J. Super. 276, 283 (App. Div. 2017) (alteration in original) (quoting Puder v. Buechel, 183 N.J. 428, 440-41 (2005)). "Competent opposition requires 'competent evidential material' beyond mere 'speculation' and 'fanciful arguments.'" Hoffman v. Asseenontv.Com, Inc., 404 N.J. Super. 415, 426 (App. Div. 2009) (quoting Merchs. Express Money Order Co. v. Sun Nat'l Bank, 374 N.J. Super. 556, 563 (App. Div. 2005)).

If there is no genuine issue of material fact, we must then "decide whether the trial court correctly interpreted the law." DepoLink Court Reporting & Litig.

Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)). We review issues of law de novo and accord no deference to the trial judge's legal conclusions. Nicholas v. Mynster, 213 N.J. 463, 478 (2013). Applying the above standards, we discern no reason to reverse the grant of summary judgment to either RD Legal or Osborn.

Bogert concedes he agreed to the Subordination Agreement to induce RD Legal to continue purchasing Prospective Fees. However, he reiterates that the actual bargained-for consideration was his right to receive a portion of the sale proceeds under the Alleged Oral Agreement, and RD Legal deprived him of that consideration by instructing Osborn to stop payment.

"In general, contracts are enforceable only if they are supported by consideration." Sipko v. Koger, Inc., 214 N.J. 364, 380 (2013). "If the consideration requirement is met, there is no additional requirement of gain or benefit to the promisor, loss or detriment to the promisee, equivalence in the values exchanged, or mutuality of obligation." Ibid. (quoting Martindale v. Sandvik, Inc., 173 N.J. 76, 87 (2002)). Furthermore, "[i]t has been long accepted that the value given or received as consideration need not be monetary or substantial[.]" Oscar v. Simeonidis, 352 N.J. Super. 476, 485 (App. Div. 2002).

16

Thus, "[c]ourts . . . do not inquire into the adequacy of consideration in determining whether to enforce a contract." Seaview Orthopaedics v. Nat'l Healthcare Res., Inc., 366 N.J. Super. 501, 508-09 (App. Div. 2004). As we have held:

> Any inquiry into the presence of consideration does not depend upon the comparative value of the "things" exchanged. Instead, when we speak of the need for an exchange of valuable consideration what is meant is that the consideration "must merely be valuable in the sense that it is something that is bargained for in fact."
>
> [Id. at 509 (citation omitted) (quoting Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959, 980 (D.N.J. 1981)).]

"When a trial court's decision turns on its construction of a contract, appellate review of that determination is de novo." Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 115 (2014). "If the language of a contract 'is plain and capable of legal construction, the language alone must determine the agreement's force and effect.'" Id. at 118 (quoting Twp. of White v. Castle Ridge Dev. Corp., 419 N.J. Super. 68, 74-75 (App. Div. 2011)). Interpretation and construction of a contract may be decided on summary judgment "unless the meaning is both unclear and dependent on conflicting testimony." Celanese Ltd. v. Essex Cty. Improvement Auth., 404 N.J. Super. 514, 528 (App. Div. 2009)

(quoting Bosshard v. Hackensack Univ. Med. Ctr., 345 N.J. Super. 78, 92 (App. Div. 2001)).

The language in the Subordination Agreement regarding consideration is clear and unambiguous. The Subordination Agreement expressly provides that Bogert assigned and subordinated to RD Legal all his attorney's fees derived from the ONJ Litigations "in consideration" for "induc[ing] RD Legal to provide financing to [B&O] and Osborn . . . pursuant to the terms of the [B&O and Osborn] Agreements and the B&O Loan Agreement[.]" This language leaves no doubt that Bogert agreed to the Subordination Agreement so that RD Legal would continue providing funds to Osborn that he and Bogert needed to continue prosecuting and financing the ONJ Litigations. RD Legal's continued purchase of Prospective Fees therefore constituted valuable consideration to Bogert for the Subordination Agreement. "The court will not make a different or better contract than the parties have seen fit to make for themselves." Great Atl. & Pac. Tea Co. v. Checchio, 335 N.J. Super. 495, 501 (App. Div. 2000) (quoting Schnakenberg v. Gibraltar Sav. & Loan Ass'n, 37 N.J. Super. 150, 155 (App. Div. 1955)).[4]

---

[4] Bogert relies on an Iowa Supreme Court case, Hubbard Mill Co. v. Citizens State Bank, 385 N.W.2d 255 (Iowa 1986), to support his argument that a defense

We reject Bogert's claim that the actual bargained-for consideration for the Subordination Agreement was his right to a portion of the sale proceeds under the Alleged Oral Agreement. The Subordination Agreement expressly provides that if there was a conflict between its provisions and the provisions of any other agreement, its provisions "shall control" and "[o]nly a writing signed by all parties hereto may amend this Agreement." The Subordination Agreement contains no language supporting or referring to Bogert's version of consideration, his version conflicts the Subordination Agreement, and he admitted his version was not memorialized. Thus, the consideration term in the Subordination Agreement controls.

Second, there is no evidence that Bogert communicated to RD Legal that he intended his version of consideration be the actual bargained-for consideration for the Subordination Agreement. On the contrary, Bogert admitted he did not engage in negotiations over the terms of the Subordination Agreement and he executed the Subordination Agreement RD Legal presented to him with no changes.

---

of lack of consideration "is not precluded even when the parties recite some consideration in their argument." However, we are not bound by published out-of-state opinions. Pressler & Verniero, Current N.J. Court Rules, cmt. 3.5 on R. 1:36-3 (2019).

Further, Bogert claimed that, prior to executing the Subordination Agreement, he faxed an unsigned copy of it to RD Legal, advising of his transaction with JD Capital. However, he admitted he did not express his intent that his version of consideration be the actual bargained-for consideration and did not ask anyone to put this version in the Subordination Agreement.

It is well-established that "the secret, unexpressed intent of a party cannot be used to vary the terms of an agreement." Domanske v. Rapid-American Corp., 330 N.J. Super. 241, 246 (App. Div. 2000). "A contracting party is bound by the apparent intention he or she outwardly manifests to the other party. It is immaterial that he or she has a different, secret intention from that outwardly manifested." Cumberland Farms, Inc. v. N.J. Dep't of Envtl. Prot., 447 N.J. Super. 423, 440 (App. Div. 2016) (quoting Hagrish v. Olson, 254 N.J. Super. 133, 138 (App. Div. 1992)).

By executing the Subordination Agreement, and without engaging in negotiations, Bogert "outwardly manifest[ed] to the other party" an intention to accept the terms of the agreement and the consideration provided therein. See ibid. (quoting Hagrish, 254 N.J. Super. at 138). Thus, to the extent Bogert claims he entered into the Subordination Agreement for reasons other than those provided by its express terms, such a "different, secret intention" cannot be used

to vary the consideration expressly provided in the agreement. Ibid. (quoting Hagrish, 254 N.J. Super. at 138). Accordingly, Bogert is bound by the terms of the Subordination Agreement and his private intent to condition his performance on his version of consideration "did not create a material question of fact for purposes of summary judgment analysis." Domanske, 330 N.J. Super. at 247-48.

We also reject Bogert's argument that the court erred by ignoring the parties' course of dealing prior to the Subordination Agreement. The Subordination Agreement clearly and unambiguously provides that "[n]o course of dealing, course of performance or trade usage, and no parole evidence of any nature, shall be used to supplement or modify any terms of this Agreement. Only a writing signed by all parties hereto may amend this Agreement." Thus, Bogert cannot rely on the parties' course of dealing to vary or alter the consideration expressed in the Subordination Agreement.

Even accepting as true Bogert's claim that he was entitled to a portion of the sale proceeds, his right to those proceeds could not have constituted valid consideration for the Subordination Agreement. According to Bogert, the Alleged Oral Agreement, which obligated Osborn to pay him $10,000 per month from the sale proceeds, was made on January 6, 2009, eight months before

Bogert executed the Subordination Agreement on September 30, 2009. That obligation therefore was pre-existing and could not constitute valid consideration for the Subordination Agreement. See Segal v. Lynch, 211 N.J. 230, 253 (2012) ("[C]onsideration cannot be a promise to perform a pre-existing duty."); Bernetich, Hatzell & Pascu, LLC v. Med. Records Online, Inc., 445 N.J. Super. 173, 183 (App. Div. 2016) ("[C]onsideration generally may not be furnished by fulfilling a pre-existing legal duty."). "The principle is firmly imbedded in our jurisprudence that a promise to do what the promisor is already legally bound to do is an unreal consideration." M. N. Axinn Co. v. Gibraltar Dev., Inc., 45 N.J. Super. 523, 533 (App. Div. 1957).

In addition, even accepting the Alleged Oral Agreement existed, Bogert admitted he was only entitled to receive a portion of the sale proceeds for one year, until January 2010. He also admitted he received a portion of the sale proceeds until January 2010, when RD Legal allegedly instructed Osborn to stop payment. Thus, Bogert was not deprived of the benefit he claims he was entitled to under the Alleged Oral Agreement because he received a portion of the sale proceeds for the entire term of the Alleged Oral Agreement.

Nevertheless, Bogert argues he did not benefit from the funds provided to Osborn because Osborn only used a portion of the sale proceeds to fund the ONJ

Litigations. However, Bogert ignores the fact that there were no restrictions on RD Legal's advancement or Osborn's use of the sale proceeds. The Subordination Agreement clearly and unambiguously provides "that RD Legal may continue, at any time and without notice to [Bogert] to extend financial accommodations for the benefit of [B&O] and [Osborn] in such amounts and on such terms and conditions as RD Legal, [B&O] and [Osborn] may agree." It is therefore clear that Osborn was not restricted in his use of the sale proceeds, and the fact that he may have used only a portion to fund the ONJ Litigations did not alter the consideration for Bogert's Subordination Agreement.

This argument also fails under the principle that "[a]ny inquiry into the presence of consideration does not depend upon the comparative value of the 'things' exchanged." Seaview Orthopaedics, 366 N.J. Super. at 509. "A very slight advantage to one party, or a trifling inconvenience to the other, is a sufficient consideration to support a contract[.]" Oscar, 352 N.J. Super. at 485 (quoting Joseph Lande & Son, Inc. v. Wellsco Realty, Inc., 131 N.J.L. 191, 198 (E. & A. 1943)). Furthermore, "[i]f the consideration requirement is met, there is no additional requirement of gain or benefit to the promisor, loss or detriment to the promisee, equivalence in the values exchanged, or mutuality of

obligation." Ibid. (quoting Shebar v. Sanyo Bus. Sys. Corp., 111 N.J. 276, 289 (1988)).

The consideration to Bogert for the Subordination Agreement was RD Legal's continued purchase of Prospective Fees. RD Legal provided this consideration by continuing to purchase Prospective Fees after the effective date of the Subordination Agreement and Bogert benefitted from same through his ability to continue prosecuting and funding the ONJ Litigations. There is no additional requirement that Bogert gain a monetary benefit, or that there be an "equivalence in the values exchanged, or mutuality of obligation." See ibid. (quoting Shebar, 111 N.J. at 289).

Bogert also argues that if the consideration was RD Legal's continued purchase of Prospective Fees, RD Legal would have required him to enter into the Subordination Agreement sooner, when it initially began purchasing those fees. However, Bogert provides no basis for this claim and ignores that RD Legal was not obligated to purchase Prospective Fees under the B&O and Osborn Agreements. RD Legal was entitled to deny a request for additional funding at any time, or request additional security for that funding. In this instance, RD Legal required Bogert and Osborn to execute a Subordination

Agreement because it "was concerned about collateral and security and told [Osborn] that [it] might have to discontinue funding."

Bogert further argues that RD Legal breached the implied covenant of good faith and fair dealing by instructing Osborn to stop payment and allowing Osborn to sell Bogert's interest under the Fee Agreement for no consideration to Bogert in breach of the Alleged Oral Agreement. We disagree.

"A covenant of good faith and fair dealing is implied in every contract in New Jersey." Wilson v. Amerada Hess Corp., 168 N.J. 236, 244 (2001). It has been formulated by our Supreme Court as follows:

> In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; which means that in every contract there exists an implied covenant of good faith and fair dealing.
>
> [Id. at 245 (quoting Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 421 (1997)).]

To establish a claim for a breach of that duty, the claimant must therefore allege conduct by the opposing party which "destroyed [the claimant]'s reasonable expectations and right to receive the fruits of the contract[.]" Sons of Thunder, 148 N.J. at 425.

A-4909-15T2

RD Legal did not breach the implied covenant of good faith and fair dealing, nor did Osborn. The Subordination Agreement expressly permitted RD Legal "to extend financial accommodations for the benefit of [B&O] and Osborn . . . on the faith hereof, in such amounts and on such terms and conditions as RD Legal, [B&O] and [Osborn] may agree." As our Supreme Court has consistently held, "the 'implied covenant of good faith and fair dealing cannot override an express term in a contract.'" Seidenberg v. Summit Bank, 348 N.J. Super. 243, 258 (App. Div. 2002) (quoting Wilson, 168 N.J. at 244).

Second, and perhaps most important, Bogert failed to substantiate the existence of the Alleged Oral Agreement. Thus, as the trial court found, breaching the Alleged Oral Agreement cannot constitute a breach of the implied covenant of good faith and fair dealing. Even accepting as true that RD Legal instructed Osborn to stop payment, this is of no moment. Bogert had no entitlement to the sale proceeds under the B&O and Osborn Agreements, and his receipt of a portion of same from Osborn under the Alleged Oral Agreement was not a "fruit" of the Subordination Agreement.

Further, Bogert misconstrues the factual record. He contends that RD Legal instructed Osborn to stop payment in January 2010. However, the record reveals that Bogert received $4000 from Osborn in February 2010, $3000 in

26

March 2010, $2,195.46 in June 2010, $4,832.80 in August 2010, and $1400 in September 2010, after the alleged stop payment. Osborn testified at his deposition that he stopped paying Bogert because he could no longer afford to do so. While Bogert disputes that explanation, the payments Osborn made to him after the alleged payment stoppage severely undercut his claim that RD Legal instructed Osborn to stop paying him in January 2010.

Bogert insists the grant of summary judgment to RD Legal was improper because there is a genuine issue of material fact regarding whether or not the Alleged Oral Agreement existed and whether his rights thereunder constituted the bargained-for consideration for the Subordination Agreement. Bogert argues the court erred in finding there was no evidence that the Alleged Oral Agreement existed, citing to a list of facts he claims the court failed to view in the light most favorable to him. However, these "facts" do not support Bogert's claim that the Alleged Oral Agreement existed. Moreover, even if Bogert had provided sufficient evidence to show the Alleged Oral Agreement existed, Osborn's obligations thereunder do not create a genuine issue of material fact sufficient to defeat RD Legal's summary judgment motion.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;

the requirement is that there be no genuine issue of material fact." Alfano v. Schaud, 429 N.J. Super. 469, 475 (App. Div. 2013) (alteration in original) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)). Thus, "[w]hile 'genuine' issues of material fact preclude the granting of summary judgment, those that are 'of an insubstantial nature' do not." Brill, 142 N.J. at 530 (citation omitted) (quoting Judson v. Peoples Bank & Tr. Co., 17 N.J. 67, 75 (1954)). "In other words, where the party opposing summary judgment points only to disputed issues of fact that are 'of an insubstantial nature,' the proper disposition is summary judgment." Id. at 529 (quoting Judson, 17 N.J. at 75).

Although the parties dispute whether the Alleged Oral Agreement actually existed, the existence of that agreement was not relevant to the issues raised in RD Legal's summary judgment motion unless Bogert's rights thereunder constituted valid consideration for the Subordination Agreement, which they did not. As previously noted, the clear and unambiguous terms of the Subordination Agreement and the principles of contract law contradict Bogert's version of consideration. The Subordination Agreement clearly sets forth the consideration for the agreement and mentions nothing about the Alleged Oral Agreement or Bogert's intent that his right to a portion of the sale proceeds was the bargained-for consideration. It is therefore clear, as a matter of law, that even if it existed,

the Alleged Oral Agreement could not have constituted the consideration for the Subordination Agreement, and therefore the issue of whether or not the agreement existed was immaterial to RD Legal's motion for summary judgment.

"To send a case to trial, knowing that a rational jury can reach but one conclusion, is indeed 'worthless' and will 'serve no useful purpose.'" Id. at 541. As the trial court found, the competent evidential materials presented leave no doubt about whether the Subordination Agreement was enforceable and entitled RD Legal to the attorney's fees Bogert derived from the ONJ Litigations. There is no evidence from which a jury could conclude that RD Legal deprived Bogert of his bargained-for consideration. Accordingly, summary judgment in favor of RD Legal was appropriate.

## III.

Bogert next contends the court erred in granting summary judgment to Osborn and dismissing Bogert's claim for reimbursement. He argues there was a material question of fact as to whether he and Osborn entered into the Alleged Reimbursement Agreement. He maintains that pursuant to the Alleged Reimbursement Agreement, he was entitled to reimbursement from Osborn in the event he had to pay RD Legal the attorney's fees he derived from the ONJ

Litigations in an amount greater than what he received from Osborn from the sale proceeds.

The court found that Bogert provided "no written evidence of [the Alleged Reimbursement Agreement], no evidence referring to the existence of any such agreement, no details on when it was entered or what its specific terms are." The court thus concluded there was no evidence the Alleged Reimbursement Agreement existed.

The court's conclusion is unassailable. There was no evidence beyond Bogert's naked assertions to substantiate the existence of the Alleged Reimbursement Agreement. "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Sullivan, 449 N.J. Super. at 283 (alteration in original) (quoting Puder, 183 N.J. at 440-41). Accordingly, the grant of summary judgment to Osborn and dismissal of the third-party complaint was proper.

IV.

Bogert filed a notice of appeal on July 15, 2016. On September 13, 2017, he moved before this court to remand the matter to the trial court to enable him

to file a motion to vacate judgment pursuant to <u>Rule</u> 4:50-1(b) based on newly discovered evidence. We granted the motion, remanded the matter to the trial court, and retained jurisdiction.

On February 23, 2018, Bogert filed a motion to vacate judgment as to RD Legal based on newly discovered evidence consisting of evidence derived from a July 14, 2016 administrative action the Securities and Exchange Commission (SEC) brought against Dersovitz and RD Legal Capital, a general partner of RD Legal. Bogert's motion concerned two areas of Dersovitz's testimony in the SEC litigation, which, according to Bogert, contradicted material information RD Legal provided in this litigation. First, RD Legal represented in this litigation that it lost money on its purchase of Prospective Fees when it, in fact made a $500,000 profit by engaging in a side Participation Agreement with a third-party investor, Constant Cash Yield Ltd. (CCY). Second, RD Legal did not continue purchasing Prospective Fees for Bogert's benefit in reliance on the Subordination Agreement, but rather provided funding to Osborn to keep Osborn afloat as a "workout" situation to protect RD Legal's position and collateral and to ensure repayment of past-due funds.

In a May 7, 2018 written opinion, the court determined the evidence was new. However, the court was not satisfied this new evidence was unavailable

in this litigation. In sum, the court held that Bogert failed to inquire as to whether RD Legal was engaged in a "workout" with Osborn, whether RD Legal considered that its advances to Osborn enhanced the protections to RD Legal's collateral and position, or whether RD Legal was involved in transactions with third-party investors. After reviewing the discovery demands and responses, the court concluded "there were [not] any false or misleading responses as to the matters under consideration[.]"[5]

Addressing the merits, the court found that neither RD Legal's Participation Agreement with CCY, nor the alleged "true purpose" behind RD Legal's continued advancement of funding to Osborn, altered its initial decisions. The court held:

> [t]hat RD Legal entered into a side-agreement with a third-party investor — which RD Legal was specifically entitled to do under the Subordination Agreement — does not in any way affect the rights or obligations of the parties under the Subordination Agreement. This court's decision did not turn on whether there was any such third-party investor agreement — which it now appears there was — nor whether RD Legal earned income as a result of any such third-party investor agreement — which it appears RD Legal did.

---

[5] This holding directly conflicts with Bogert's continued argument that RD Legal deliberately failed to disclose these matters in discovery.

We review the trial court's denial of a motion to vacate final judgment for abuse of discretion. Deutsche Bank Nat'l Tr. Co. v. Russo, 429 N.J. Super. 91, 98 (App. Div. 2012). "'The trial court's determination under [Rule 4:50-1] warrants substantial deference,' and the abuse of discretion must be clear to warrant reversal." Ibid. (alteration in original) (quoting U.S. Bank Nat'l Ass'n v. Guillaume, 209 N.J. 449, 467 (2012)). "It is within the trial court's sound discretion, guided by equitable principles, to decide whether relief should be granted pursuant to Rule 4:50-1." In re Guardianship of J.N.H., 172 N.J. 440, 473 (2002).

"To obtain relief from a judgment based on newly discovered evidence [under Rule 4:50-1(b)], the party seeking relief must demonstrate 'that the evidence would probably have changed the result, that it was unobtainable by the exercise of due diligence for use at the trial, and that the evidence was not merely cumulative.'" DEG, LLC v. Twp. of Fairfield, 198 N.J. 242, 264 (2009) (quoting Quick Chek Food Stores v. Twp. of Springfield, 83 N.J. 438, 445 (1980)).

Under the Subordination Agreement, RD Legal had "the right to assign any portion or all of its rights, interests and obligations under this Agreement." Given this right, even accepting as true that RD Legal (1) made a profit on its

A-4909-15T2

investment by engaging in a side transaction with a third-party investor, and (2) advanced monies not for Bogert's benefit but to enhance and protect its own collateral, neither claim is relevant.

The Subordination Agreement expressly permitted the Participation Agreement between RD Legal and CCY, and therefore that agreement has no impact on Bogert's obligations under the Subordination Agreement. Bogert is therefore not entitled to a credit against his obligations for the amounts RD Legal received from CCY. As the Subordination Agreement expressly provides, Bogert is obligated to "subordinate [his share of Prospective Fees] to the payment in full of all of [Osborn's] [o]bligations"; there is no "set off" for funds received by RD Legal by way of a third-party side-agreement.

Bogert's argument also ignores the reality that the "profit" referenced in the SEC action was based on the aggregate figure RD Legal received from the return on its advancements to Osborn, and the advances RD Legal itself received from CCY, and did not account for RD Legal's obligations to CCY.

Under the terms of the Participation Agreement between RD Legal and CCY:

> (1) RD Legal agreed to sell to CCY . . . "undivided fractional interest[s]" in RD Legal's rights to legal fees from certain litigations, including the ONJ Litigations;

(2) CCY would be entitled to share, or "participate," in the collections of those legal fees "pro rata" with RD Legal and all other participants; and

(3) RD Legal agreed to be responsible to CCY for deficiencies in the collection of the legal fees purchased by CCY.

[(Citations omitted).]

Thus, the alleged "profit" of approximately $500,000 is no true profit at all.  As stated by RD Legal in this appeal:

[A]s reflected in SEC Exhibit 3116 and explained by . . . Dersovitz, RD Legal (i) advanced a total of $13,442,143 for the benefit of Osborn and his co-counsel, and (ii) received a total of $13,951,073 from two separate sources -- $6,423,782 in Legal Fees from Osborn and Powell, and $7,527,291 in proceeds from the sale of [l]egal [f]ees to CCY.  RD Legal, however, still has the obligation to pay to CCY the substantial portion of [l]egal [f]ees that it purchased in exchange for the payments totaling $7,527,291 regardless of whether that portion is ever collected from Osborn, Bogert and Powell.

[(Citations omitted).]

Clearly, under the terms of the Participation Agreement, RD Legal has not truly profited.  As, or even if, fees are remitted from Osborn to RD Legal, RD Legal must repay CCY for its advances.  Logic dictates that CCY did not "participate" for free, and RD Legal's obligation to CCY is significant.

Finally, even if we ignored RD Legal's obligations to CCY and accepted the total of $13,951,037 as the total collected such that RD Legal has "profited," that number is less than half of the $26 million RD Legal is owed from its advances to Osborn as of November 2014, "and an even smaller percentage of the total obligations once the per diem interest [that] has accrued over the last four years is added." Again, per the express terms of the Subordination Agreement, Bogert was obligated to subordinate his attorney's fees to the extent of any outstanding obligations, and not merely to the extent that RD Legal recovered its investment.

Ultimately, the court held that this "new evidence" would not alter the grant of summary judgment to RD Legal because the Subordination Agreement expressly permitted the Participation Agreement with CCY. However, it is apparent that Bogert's argument that RD Legal has profited from its advancements to Osborn is itself without merit.

Regarding Bogert's argument about the continued advancement of funding to Osborn to enhance and protect RD Legal's collateral, the court held:

> the idea that RD Legal was concerned about Osborn's economic viability and that it infused him with cash to enhance its collateral and protect its collateral is likewise not a piece of information that would cause the court to undo any of the factual or legal predicates of its summary judgment decisions or its denial of

> Bogert's motion for reconsideration. It does not relate to the parties' rights and remedies under the Subordination Agreement . . . .

Nevertheless, Bogert maintains, for the third time, that genuine issues clearly exist as to whether he received the consideration he bargained for in entering the Subordination Agreement. Bogert's argument is predicated on his purported right to share in the funds advanced by RD Legal to Osborn; this "consideration" for entering the Subordination Agreement was frustrated, says Bogert, when RD Legal advanced monies to Osborn out of its own "selfish" motivation – the enhancement and protection of its collateral, including non-ONJ Litigation collateral – while simultaneously denying Bogert the right to share in the advances to which he was allegedly entitled.

The court rejected this argument each time Bogert raised it, and so do we. The Subordination Agreement, not any unsubstantiated oral agreements, dictates the consideration to Bogert. Further, the Subordination Agreement dictated that the continued advancement of funding to Osborn was at RD Legal's discretion, and the modification of the funding arrangements would not affect Bogert's obligations under the Subordination Agreement.

In addition, there was nothing new about the fact that RD Legal provided funding to Osborn to protect non-ONJ collateral after the execution of the

Subordination Agreements. To the contrary, the parties' deposition testimony, along with the contemporaneous documents produced on summary judgment, confirmed that Bogert knew during both the pursuit of the ONJ Litigations and discovery in this action that RD Legal was advancing funds to support non-ONJ cases in which Bogert had no interest or involvement.

Because this information was known to Bogert prior to summary judgment, it cannot serve as "newly discovered evidence" for a Rule 4:50-1(b) motion. State v. Speare, 86 N.J. Super. 565, 582 (App. Div. 1965) (newly discovered evidence "must . . . have been discovered since the former trial and be such as could not have been discovered before such trial by the exercise of due diligence"). In line with the trial court's holding, while the evidence itself may be "new," the information contained therein surely was not.

It is important to note that at the time of the Subordination Agreement, Osborn, Bogert, and Powell were in financial trouble. RD Legal was frustrated, and was going to turn off its spigot. As Powell testified at in his deposition,

> the only viable option that we had that we knew of at the time to protect the interests of the clients was to keep [Osborn] alive, and the only way apparently to do that . . . was to agree to sign the [S]ubordination [A]greement so that RD Legal would continue to provide the funding to . . . keep [Osborn] in business.

A-4909-15T2

Osborn also testified to the realities of their situation: "Dersovitz made it clear that . . . he was concerned about collateral and security and told me that he might have to discontinue funding." As a result, Bogert and Powell signed subordination agreements to keep the funding flowing. However, per the express terms of Bogert's Subordination Agreement, RD Legal was permitted to fund Osborn in its sole discretion, including funding of non-ONJ Litigation, and, while Bogert may now wish to undo his decision to enter into the Subordination Agreement, such funding does not provide grounds to invalidate it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4909-15T2